BERNSTEIN, J.
This case concerns several facets of the public works bond act (PWBA), MCL 129.201 et seq. First, it poses the question of whether actual notice is required for a sub-subcontractor to recover on a payment bond when that sub-subcontractor has complied with the notice requirements set forth in MCL 129.207. Second, the case raises the question of whether a *133 PWBA claimant may recover a time-price differential and attorney fees that were provided for by the claimant’s contract with a subcontractor, but were unknown to the principal contractor holding the payment bond as well as the principal’s surety. Finally, we consider what postjudgment interest is appropriate under the PWBA. We hold that the PWBA contains no actual notice requirement for claimants that comply with the statute, that the trial court properly awarded a time-price differential and attorney fees on past-due invoices to plaintiff Wyandotte Electric Supply Company (Wyandotte), and that the trial court erred in awarding postjudgment interest under MCL 600.6013(7). Accordingly, we affirm the judgment of the Court of Appeals with regard to the first two issues and reverse with regard to the third. We remand this case to the trial court for further proceedings consistent with this opinion.
I. PACTS AND PROCEDURAL HISTORY
In 2009 and 2010, the south wing of the Detroit Public Library was renovated. Defendant KEO & Associates, Inc. (KEO) was the principal contractor for this project. Defendant Westfield Insurance Company (Westfield) supplied KEO with a payment bond worth $1.3 million, as required by the PWBA. KEO was identified as the principal contractor and Westfield as the surety on the bond. KEO subcontracted with defendant Electrical Technology Systems, Inc. (ETS) to provide labor and materials for electrical work. The agreement between KEO and ETS included a pay-if-paid clause, obliging KEO to pay ETS only after KEO had been paid for the relevant portion of work performed.
*134 ETS in turn subcontracted with Wyandotte for materials and supplies, making Wyandotte a sub-subcontractor from KEO’s perspective. ETS and Wy-andotte first formed a relationship in 2003, when they entered into an “open account” agreement that governed ETS’s purchases from Wyandotte. Under this agreement, ETS was to pay a “[tjime price differential” of 1.5% per month (18% per annum) on invoices unpaid after 30 days.[1] For the Detroit Public Library project, ETS solicited a quote from Wyandotte. On August 13, 2009, Wyandotte submitted a quote that included the 1.5% time-price differential provision. On February 19, 2010, ETS accepted the quote by issuing a purchase order totaling $143,613.25. Wyandotte first delivered materials to ETS for the project on March 3, 2010. Over the course of the project, ETS paid Wyan-dotte only sporadically, and the unpaid balance grew. Initially, Wyandotte supplied materials on credit and credited ETS’s payments to the oldest outstanding balance, but eventually Wyandotte began to ship materials only for cash on delivery. The last shipment with an unpaid balance was delivered on or about July 22, 2010; Wyandotte continued making deliveries on a cash basis until September 30, 2010.
On March 3, 2010, when it began work on the library project, Wyandotte sent letters to KEO and Westfield *135 asking for a copy of the payment bond related to the library renovation project. The letter, on Wyandotte’s letterhead, referred to the “Detroit Public Library South Wing with [ETS.] ” According to Wyandotte, KEO provided a copy of the payment bond the next day. One week later, on March 10, 2010, Wyandotte sent KEO a 30-day “Notice of Furnishing” in accordance with MCL 129.207, explaining that it was one of ETS’s suppliers. Wyandotte also sent copies of the letter to Westfield, the library, and ETS. As specified by MCL 129.207, Wyandotte sent these notices by certified mail. Additionally, Wyandotte sent the notices with return receipts requested. The notices to Westfield, ETS, and the library were all received. It is unclear what happened to the notice sent to KEO— United States Postal Service tracking indicated that it was at the Detroit Post Office on March 13, 2010, but it apparently never reached its destination. KEO states that it never received the 30-day notice. Again in accordance with the requirements of MCL 129.207, Wyandotte provided a 90-day notice of furnishing on November 1, 2010, to KEO, Westfield, ETS, and the library, stating that its last day of furnishing materials had been September 30, 2010.
Throughout the renovation project, KEO made progress payments to ETS totaling more than $248,000,[2] but ETS was not fully paying Wyandotte. KEO claims not to have been aware of Wyandotte’s involvement in the project before receiving the 90-day notice in November 2010. After receiving the 90-day notice from Wyandotte, KEO requested information from ETS confirming payments in the form of a sworn statement. *136 According to KEO, ETS provided a falsified sworn statement averring that Wyandotte had been paid $80,000. In January 2011, KEO terminated its subcontract with ETS, citing an abandonment of the project.
On January 28, 2011, Wyandotte filed a claim directly with Westfield to recover on the payment bond. Westfield denied the claim, asserting a lack of liability. Consequently, on March 14, 2011, Wyandotte filed suit against ETS, KEO, and Westfield. KEO filed a cross-claim against ETS on March 29, 2011. ETS had apparently gone out of business, and its president had declared personal bankruptcy, so it failed to appear and was defaulted. Wyandotte continued to pursue claims against KEO and Westfield on the basis of the surety bond.[3]
On September 7, 2011, Wyandotte moved for summary disposition under MCR 2.116(0(10), which tests the factual sufficiency of a complaint. The trial court heard oral argument on whether there was a valid bond claim when KEO had not received the 30-day notice of furnishing and whether Wyandotte could recover the 1.5% time-price differential and attorney fees on a bond claim. On November 4, 2011, the trial court granted Wyandotte’s motion in part, concluding that there was a valid bond claim because Wyandotte had complied with the notice requirements and that Wyandotte could recover the time-price differential as well as attorney fees. The only remaining issue was the amount of damages, and a bench trial was held on that narrow question. The trial court found that the unpaid balance owed to Wyandotte was $154,343.29, that Wyandotte was entitled to a total time-price differen *137 tial of $76,403.44, and that Wyandotte was entitled to $30,000 in attorney fees.[4] Wyandotte moved for entry of judgment and farther requested postjudgment interest under MCL 600.6013(7). The trial court granted the motion over defendants’ objections and entered a judgment in the total amount of $272,927.70.[5] The Court of Appeals affirmed the judgment in an unpublished opinion.
II. NOTICE UNDER THE PWBA
Defendants first contend that Wyandotte did not have a cause of action against them because KEO did not receive Wyandotte’s 30-day notice. We review a trial court’s summary disposition order de novo. Debano-Griffin v Lake Co, 493 Mich 167, 175; 828 NW2d 634 (2013). Likewise, questions of statutory interpretation are subject to review de novo. Elba Twp v Gratiot Co Drain Comm’r, 493 Mich 265, 278; 831 NW2d 204 (2013). When interpreting a statute, our foremost rule of construction is to discern and give effect to the Legislature’s intent. Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc, 497 Mich 337, 345; 871 NW2d 136 (2015). Because the language chosen is the most reliable indicator of that intent, we enforce clear and unambiguous statutory language as written, giving effect to every word, phrase, and clause. Id. at 345-346.
Traditionally, public property cannot be the subject of a lien unless a statute specifically permits it. Knapp v Swaney, 56 Mich 345, 347; 23 NW 162 (1885). The Legislature enacted the PWBA to protect contractors *138 and suppliers working on public projects who, unlike their private-works counterparts, have no recourse when other contractors default on their obligations. Adamo Equip Rental Co v Mack Dev Co, Inc, 122 Mich App 233, 236; 333 NW2d 40 (1982), citing Ford v State Bd of Ed, 166 Mich 658; 132 NW 467 (1911). While contractors and suppliers can place mechanics’ liens on private projects, the PWBA protects those workers on public projects by requiring the principal contractor on a public project valued at $50,000 or more to obtain a payment bond. MCL 129.201. Payment bonds serve to protect subcontractors in privity with a principal contractor, as well as remote sub-subcontractors like Wy-andotte, who are not fully compensated for their contributions to a public project. MCL 129.203. The principal contractor who obtains the bond, as well as the principal’s surety if applicable, is liable to compensate suppliers of labor or materials. Id.
MCL 129.207 provides for recovery under a principal contractor’s payment bond, but prescribes a two-step notice procedure for a remote party from the principal contractor’s perspective, that is, one lacking a direct contractual relationship with the principal contractor:
A claimant not having a direct contractual relationship with the principal contractor shall not have a right of action upon the payment bond unless (a) he has within 30 days after furnishing the first of such material or performing the first of such labor, served on the principal contractor a written notice, which shall inform the principal of the nature of the materials being furnished or to be furnished, or labor being performed or to be performed and identifying the party contracting for such labor or materials and the site for the performance of such labor or the delivery of such materials, and (b) he has given written notice to the principal contractor and the governmental unit involved within 90 days from the date on which the claimant performed the last of the labor or furnished or supplied the *139 last of the material for which the claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Each notice shall be served by mailing the same by certified mail, postage prepaid, in an envelope addressed to the principal contractor, the governmental unit involved, at any place at which said parties maintain a business or residence.
Defendants’ argument is that there can be no liability under the PWBA because KEO never actually received the 30-day notice—i.e., there was a failure of service.[6] In essence, defendants ask us to read an actual notice requirement into MCL 129.207. We decline to do so. First, we consider the plain language of the statute. Because “served” in this context is a technical word with a specific meaning in the law, we refer to that technical meaning. MCL 8.3a. “Serve” means “[t]o make legal delivery of (a notice or process)” or “[t]o present (a person) with a notice or process as required by law[.]” Black’s Law Dictionary (10th ed). Therefore, the word “served,” as used in this statute, in itself does not implicate any substantive requirements; it merely compels compliance with the relevant law.
Furthermore, service of notice is mandatory under MCL 129.207, because the statute declares that a party “shall not have a right of action upon the payment bond unless” the two notices are provided and states that the two notices “shall inform” the specified parties of certain information. However, the Legislature did not specify that actual receipt of notice is a requirement of the PWBA, although it has done so in other statutes. Some statutes mandate that a party provide service by taking actions “reasonably calcu *140 lated to give actual notice. . . See, e.g., MCL 125.2335(3); MCL 445.1539; MCL 487.3224(1). Others expand upon delivery directions, requiring that mailed notice be sent return-receipt demanded or that some additional step be taken to prove that notice was given. See, e.g., MCL 168.711 (requiring service by “registered or certified mail, with a return receipt demanded”); MCL 213.181 (requiring service by “registered mail, and a return receipt demanded”); MCL 500.2034 (requiring “the return postcard receipt for” a statement served under the statute as proof of service); MCL 290.725(3) (“The verified return of service shall be proof of the service . . . .”). The Legislature elected not to impose such a burden in MCL 129.207.
Defendants ask us to overlook the fact that Wyan-dotte sent its 30-day notice of furnishing via certified mail, return-receipt requested, and render a decision based on the fact that KEO did not receive that notice.[7] The rules of statutory construction demand that this Court “ ‘give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory.’” People v Cunningham, 496 Mich 145, 154; 852 NW2d 118 (2014), quoting State Farm Fire & Cas Co v Old Republic Ins Co, 466 Mich 142, 146; 644 NW2d 715 (2002). In addition to the portions of the statute requiring notice, MCL 129.207 specifies that “notice shall be served by *141 mailing the same by certified mail, postage prepaid . . . To accept defendants’ argument would render that phrase nugatory. In order to give effect to this phrase, we must conclude that service is accomplished when a complainant mails the required information to the proper destination by certified mail within the required time frame.
This Court previously considered the notice requirements of the PWBA in Pi-Con, Inc v A J Anderson Constr Co, 435 Mich 375; 458 NW2d 639 (1990). Defendants maintain that this Court held in Pi-Con that the PWBA contains an actual notice requirement. In Pi-Con, a supplier of materials and services to a subcontractor on a public works project sent its notice of furnishing to the principal contractor via ordinary first-class mail rather than, as required by statute, by certified mail. Id. at 378-380. The Pi-Con Court reviewed the United States Supreme Court’s construction of the Miller Act, 40 USC 3131 et seq., the federal analog to the PWBA, in Fleisher Engineering & Constr Co v United States ex rel Hallenbeck, 311 US 15; 61 S Ct 81; 85 L Ed 12 (1940), in which the Supreme Court observed:
We think that the purpose of this provision [notice by certified mail requirement] as to manner of service was to assure receipt of the notice, not to make the described method mandatory so as to deny right of suit when the required written notice within the specified time had actually been given and received. In the face of such receipt, the reason for a particular mode of service fails. It is not reasonable to suppose that Congress intended to insist upon an idle form. Rather, we think that Congress intended to provide a method which would afford sufficient proof of service when receipt of the required written notice was not shown. [Id. at 19.]
*142 Guided by the analysis in Fleisher, the Pi-Con Court concluded that service by first-class mail does not preclude recovery under the PWBA as long as the plaintiff can prove the defendant’s actual receipt of the notice by a preponderance of the evidence. Pi-Con, 435 Mich at 378.
Defendants refer to the following portion of Pi-Con to support their contention that the PWBA contains an actual notice requirement:
First, a claimant must prove that the principal contractor actually received notice. Second, the notice must relate "the nature of the materials being furnished or to be furnished, or labor being performed or to be performed and identifyD the party contracting for such labor or materials and the site for the performance of such labor or the delivery of such materials . . ..” Third, the notice sent must have been written. Fourth, the notice must have been received within the time limits prescribed by the statute. [Id. at 382 (citation omitted; alteration in original).]
But the factual underpinnings of Pi-Con are dissimilar to those in this case, and those dissimilarities affect our approach to the PWBA’s notice requirements. Pi-Con and the other Michigan cases that have previously addressed the notice requirement of MCL 129.207 all involved parties who failed to employ the statutorily prescribed delivery method—certified mail. See, e.g., Pi-Con, 435 Mich at 380 (notice sent by ordinary first-class mail); Thomas Indus, Inc v C & L Electric, Inc, 216 Mich App 603, 605-608; 550 NW2d 558 (1996) (no notice mailed but all required information included on packing slips with shipments of materials). In this case, by contrast, the parties do not dispute that Wyandotte sent notice via certified mail, although KEO apparently did not receive it. In this *143 situation, Wyandotte complied with the statute, which contains no actual notice requirement.
We reaffirm the continuing application of Pi-Con’s rule in cases in which a would-be PWBA claimant fails to comply with the particular method of service specified in MCL 129.207. To deny a PWBA claim when a preponderance of the evidence demonstrates that notice was actually received would improperly “elevat[e] form over substance.” Pi-Con, 435 Mich at 385. Similarly, it would be more than passing strange to penalize a claimant for complying with the notice provisions outlined in the statute, as Wyandotte has done here. We conclude that, when a claimant has complied with the notice procedures set forth by the Legislature in MCL 129.207, there is no actual notice requirement.
III. RECOVERABILITY OF A TIME-PRICE DIFFERENTIAL AND ATTORNEY FEES[8]
In prevailing on its PWBA claim, Wyandotte was awarded a judgment in the trial court that included a time-price differential and attorney fees, which had been provided for in its contract with ETS. To the extent that this issue is one of statutory interpretation of the PWBA, we review it de novo. Elba Twp, 493 Mich at 278. To the extent that it involves interpreting the contract between Wyandotte and ETS, this is also a question subject to review de novo. Rory v Continental Ins Co, 473 Mich 457, 464; 703 NW2d 23 (2005). Our *144 goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself. Id. at 468.
The PWBA permits an unpaid supplier of materials or labor to “sue on the payment bond for the amount, or the balance thereof, unpaid at the time of institution of the civil action, prosecute such action to final judgment for the sum justly due him and have execution thereon.” MCL 129.207. Wyandotte sought payment based on its prior contracts with ETS: the open-account agreement enacted in 2003, the bid Wyandotte made for the Detroit Public Library project in 2009, and the ensuing purchase orders. Wyandotte argued, and the lower courts agreed, that Wyandotte was entitled to the unpaid balance on the materials and supplies it had provided as well as further damages based on the following two provisions that appeared in the open-account agreement:
TIME PRICE DIFFERENTIAL Time price differential charges of V-h% per month (18% per annum) are calculated on all invoices that are not paid and past due 30 days or more. You will be issued a separate invoice detailing these (finance) charges.
* * *
PAST DUE ACCOUNTS Accounts that are past due will be taken off open account and placed on C.O.D. until their account is brought back into current status. In the event your account is placed in the hands of an attorney for collection after default, the customer agrees to pay 33% of the unpaid balance for attorney’s fees together with applicable costs.
The time-price differential provision also appeared on the quote for the library project.
*145 As an initial matter, defendants maintain that they cannot be liable for either type of fee because they were not in contractual privity with Wyandotte and never agreed to pay these fees. This privity argument is unpersuasive. Contractual privity is plainly not a requirement for recovery under MCL 129.207, which specifically allows a “claimant not having a direct contractual relationship with the principal contractor” to seek recovery on the payment bond. Defendants’ privity argument would strip away the PWBA’s protection of remote contractors.
The dispositive question here is rather the meaning of “sum justly due” in MCL 129.207. The statute merely states that a complainant may sue “on the payment bond for the amount, or the balance thereof, unpaid” and that a final judgment may be rendered for the “sum justly due . . . .” MCL 129.207. Neither of these phrases explicitly informs us whether the Legislature intended to encompass additional contractual provisions, such as time-price differential fees or attorney fees, as part of the sum justly due.[9]
*146 The Court of Appeals considered the scope of the phrase “sum justly due” under the PWBA in Price Bros Co v Charles J Rogers Constr Co, 104 Mich App 369; 304 NW2d 584 (1981). The plaintiff in Price Bros was retained by a contractor on a public works project to provide sewer pipe for installation. The two contracts at issue related to the sewer pipe project and contained the following clause:
Payment shall be due 30 days after the date of the statement. A service charge of IV2 percent per month on the unpaid balance will be due on all amounts unpaid for 30 days after the due date. A 5% cash discount is applicable if paid within 30 days of the date of statement providing no other indebtedness to Price Brothers Company is delinquent. [Id. at 376.]
The Court of Appeals considered whether the service charge constituted a separate extension of credit or a “flexible price factor employed to reflect plaintiffs increased costs when its bills are not paid promptly.” *147 Id. at 377. The Price Bros Court concluded that the service charge fell into the latter category and was recoverable under the PWBA as an “integral part of the cost of the transaction” and an “integral part of the contract between [the parties].” Id. at 377, 379. However, the Price Bros Court did not provide any justification for the use of this standard or consider other approaches to understanding the term “sum justly due.” We therefore do not find it clarifying in this case.
Wyandotte’s position, and that adopted by the Court of Appeals, is that the sum justly due for PWBA purposes is the amount provided for in the claimant’s contract, regardless of whether the principal contractor and its surety have agreed to that contract’s terms. An alternative position is to use the value of the labor or materials. We conclude that the former approach is more consistent with the plain language of the PWBA, which refers to the “amount. . . unpaid” at the time of institution of the action and does not expressly state (or limit) what kinds of damages are recoverable. This phrase implies a previous expectation of payment of a certain sum. In the absence of any further direction from the Legislature regarding how the amount unpaid ought to be determined, the most logical recourse is to the claimant’s underlying contract, which best illustrates the intent and expectations of the parties to the contract. The Legislature does not differentiate the amount unpaid from the sum justly due, and we understand that sum to be determined based on the trial court’s fact-finding as to the amount unpaid.
Because we use the contract to determine the sum justly due, we must ascertain what actually constituted the contract in this case. There were multiple written instruments evidencing the agreement between Wyandotte and ETS: the open-account agree *148 ment dating back to 2003, the quote for the library project, and the purchase orders related to the project. In our recent opinion in Beck v Park West Galleries, Inc, 499 Mich 40; 878 NW2d 804 (2016), we acknowledged the general rule that separate agreements are treated separately. However, when parties enter into multiple agreements relating to the same subject-matter, we must read those agreements together to determine the parties’ intentions. Culver v Castro, 126 Mich App 824, 826; 338 NW2d 232 (1983), citing Reber v Pearson, 155 Mich 593; 119 NW 897 (1909). Although the initial open-account agreement does not relate specifically to the library project, all of these agreements are directed to the same end—Wyandotte’s provision of materials to ETS. Further, by its terms, the open-account agreement covered all “past, present and future unpaid accounts receivable balances” between Wyandotte and ETS. Together, these agreements demonstrate that Wyandotte and ETS intended to enter into an ongoing business relationship, and these agreements define the scope of that relationship. We therefore conclude that these agreements should be considered together.
The open-account agreement includes provisions regarding both a time-price differential and attorney fees. The later quote for the library project reiterated the time-price differential provision but was silent regarding attorney fees. But because the quote did not contradict the attorney fees clause present in the initial agreement, we conclude that the documents are not inconsistent and that the later quote and purchase orders did not supersede the initial agreement. See Culver, 126 Mich App at 828. Accordingly, both the open-account agreement and the subsequent agreements relating specifically to the library project apply here.
*149 We do not believe that a PWBA claimant’s recovery is limited to the terms of a contract or contracts relating to the provision of labor and materials for a specific public works project when additional contracts also govern the parties’ relationship with regard to that project. To the extent that the PWBA refers to public works project contracts, it refers to the primary contract between a principal contractor and a governmental unit. For example, MCL 129.201, which obliges a principal contractor to obtain a payment bond, only discusses this primary contract. Similarly, MCL 129.203 provides:
The payment bond shall be in an amount fixed by the governmental unit but not less than 25% of the contract amount solely for the protection of claimants, as defined in [MCL 129.206], supplying labor or materials to the principal contractor or his subcontractors in the prosecution of the work provided for in the contract. [Emphasis added.]
See also MCL 129.202. As with MCL 129.201, the phrase “the contract” in MCL 129.203 must refer to the primary contract between a principal contractor and a governmental unit. MCL 129.203 directs the principal contractor to obtain a payment bond; in stating that the payment bond shall be in an amount not less than 25% of the contract amount, the statute clearly indicates that the term “the contract” refers to the primary contract, because the principal contractor does not obtain separate payment bonds for each lesser contract with a subcontractor. Therefore, the discussion in MCL 129.207 of “[a] claimant who has furnished labor or material in the prosecution of the work provided for in such contract in respect of which payment bond is furnished under the provisions of [MCL 129.203]” refers to that primary contract yet again. It does not limit a PWBA claimant’s reasonably expected recovery when the claimant is a sub-subcontractor.
*150 A sub-subcontractor is, by definition, not a party to the primary contract. Given that the PWBA does not require a sub-subcontractor to be in privity of contract with the principal contractor in order to obtain relief, we hold that the PWBA allows a sub-subcontractor to rely on the terms of the agreement or agreements that govern its relationship with a subcontractor. There are, of course, scenarios in which a contract predating the specific public works project would properly be disregarded under the PWBA: namely, when the prior contract is limited in scope and has no bearing on either the public works project or any continuing contractual relationship between the involved parties. However, where, as here, the language of an earlier contract indicates that ETS and Wyandotte intended it to govern their ongoing business relationship, we consider it alongside the specific contracts relating to the public works project.
At the time Wyandotte commenced this action, ETS had already fallen behind on its payments to Wyan-dotte for the materials it had provided in connection with the library project. The time-price differential referred to in the contracts between Wyandotte and ETS was in play, reflecting the increased cost to Wyandotte as ETS’s bills went underpaid or unpaid. Therefore, a time-price differential was part of the amount unpaid and due to Wyandotte when it instituted the instant action against defendants. The trial court properly included the time-price differential as part of the judgment in Wyandotte’s favor.
Regarding attorney fees, defendants correctly argue that Michigan follows the American rule, which provides that attorney fees are not to be awarded unless specifically provided for by a statute, rule, or contractual provision. Watkins v Manchester, 220 Mich App *151 337, 342; 559 NW2d 81 (1996). Defendants rely heavily on the fact that the PWBA does not expressly provide for an award of attorney fees, but fail to note that the open-account agreement did in fact have an attorney fees provision.[10] And, as noted previously, the agreement covered all of ETS’s “past, present and future unpaid accounts receivable balances” with Wyandotte. Thus, the terms of the open-account agreement clearly indicate that ETS and Wyandotte intended that the attorney fees clause would apply for the duration of their ongoing business relationship. Therefore, it was not improper for the trial court to include attorney fees in its judgment as part of the sum justly due.[11]
We conclude that, because the underlying contract is the source by which we determine what relief a PWBA claimant may seek, Wyandotte is entitled to the time- *152 price differential and attorney fees it would have received under its contracts with ETS.
IV. INTEREST ON THE JUDGMENT
The trial court awarded, and the Court of Appeals affirmed, postjudgment interest to Wyandotte under MCL 600.6013(7), which provides:
For a complaint filed on or after July 1, 2002, if a judgment is rendered on a written instrument evidencing indebtedness with a specified interest rate, interest is calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate specified in the instrument if the rate was legal at the time the instrument was executed. If the rate in the written instrument is a variable rate, interest shall be fixed at the rate in effect under the instrument at the time the complaint is filed. The rate under this subsection shall not exceed 13% per year compounded annually.
Defendants contend that this was not the proper section under which to calculate interest on the judgment. We review this question of statutory interpretation de novo and seek to effect the Legislature’s intent, turning first to the plain language of the statute. See Elba Twp, 493 Mich at 278.
MCL 600.6013(7) applies when certain criteria are met: the judgment must be “rendered on” a written instrument, the instrument must evidence indebtedness, and there must be a specified interest rate. This issue may be resolved based upon the first criterion. “Render” means, in relevant part, “to cause to be or become” and “to hand down (a legal judgment).” Merriam-Webster’s Collegiate Dictionary (11th ed). To the extent that “render” is a technical legal term, to render means “to deliver formally” when undertaken *153 by a judge. Black’s Law Dictionary (10th ed).[12] This restrictive term requires the written instrument to be the actual basis of the judgment for MCL 600.6013(7) to apply.
The judgment here was not rendered on a written instrument. Regardless of whether the documents evidencing the contract between Wyandotte and ETS can even be said to constitute a written agreement for purposes of interest on the judgment, the judgment in this case was not rendered on them. Although the contract between Wyandotte and ETS defined the scope of the damages that Wyandotte was entitled to seek under the PWBA, the underlying claim was not a contract claim.[13] Wyandotte’s cause of action did not arise directly out of its contract; it arose out of the PWBA. Without the legislatively provided remedy of the PWBA, Wyandotte would not have had a claim against defendants. Therefore, even though the contract between ETS and Wyandotte determined the extent of Wyandotte’s recovery, judgment was rendered on Wyandotte’s statutory claim rather than on the contract itself. Because judgment was not rendered on a written instrument at all, we need not address whether the written instrument in this case evidenced indebtedness at a specified interest rate. Interest on the judgment should instead be calculated under MCL 600.6013(8), the general rule for interest on a money judgment in a civil case.
*154 V. CONCLUSION
We conclude that MCL 129.207 did not require actual receipt of notice by the principal, that a time-price differential and attorney fees were part of the sum justly due to Wyandotte under its contracts, and that interest on the judgment should have been calculated under MCL 600.6013(8) rather than MCL 600.6013(7). Accordingly, we affirm in part and reverse in part the judgment of the Court of Appeals and remand to the trial court for entry of a judgment consistent with these holdings.
Markman, McCormack, Viviano, and Larsen, JJ., concurred with BERNSTEIN, J.

 The term “time-price differential” refers to the difference between the current cash price of an item and the cost of purchasing the item with credit. A payment made with cash is immediate; a payment made with credit is not. Thus, when a payment is made with credit, the seller is burdened by a cash-flow interruption. A time-price differential compensates for the increased cost to a seller for credit. It reflects the difference between the credit price and the cash price. Price Bros Co v Charles J Rogers Constr Co, 104 Mich App 369, 377; 304 NW2d 584 (1981), citing Silver v Int'l Paper Co, 35 Mich App 469, 470; 192 NW2d 535 (1971). Despite the contract provision, Wyandotte’s business practice was to wait 60 days to pursue the time-price differential.

 KEO claims to have paid more than it owed; ETS claims that KEO failed to pay what it owed to ETS. In any case, Wyandotte nndispntedly did not receive full payment.

 Because KEO and Westfield’s financial interests with respect to this project are aligned, they have filed joint arguments in this appeal. We refer to them jointly as “defendants” throughout this opinion.

 The attorney fees award was agreed to by the parties and was less than the attorney fees provided for in the contract.

 The final award also included, under MCR 2.403(0), $12,180.97 for fees and costs arising out of defendants’ rejection of a case evaluation.

 Defendants do not argue in this Court that Wyandotte failed to serve the 90-day notice required by MCL 129.207.

 At oral argument, defendants additionally suggested that service with return-receipt requested was not in conformity with MCL 129.207. We do not find compelling defendants’ contention that Wyandotte failed to comply with the statute when it took the additional precaution of sending its correspondence return-receipt requested. The plain language of MCL 129.207 does not require a return receipt, and we decline to read such language into the statute. But we also do not believe that a party that requests a return receipt when sending notice by certified mail is not entitled to a right of action on a payment bond under MCL 129.207.

 We acknowledge that there may be an issue with regard to whether the “attorney fees” requested by Wyandotte are appropriately referred to as such. In this case, the term “attorney's fees” arises out of a “PAST DUE ACCOUNTS” provision in ETS’s open-account agreement with Wyandotte and differs from a traditional attorney fees provision. For the sake of simplicity, we follow the language used in the contract, and by the parties and the Court of Appeals, in continuing to use the term “attorney fees.”

 We recognize Chief Justice Young’s argument in his partial dissent that MCL 129.207 limits a claimant to recovery of a sum “integrally related to the cost of labor or materials furnished for the project.” We find no statutory support for this conclusion. Contrary to his reading of MCL 129.207, the language “[a] claimant who has furnished labor or material in the prosecution of the work provided for in such contract” merely serves to identify who may make a claim under the PWBA—a party who has furnished labor or materials. It does not by its plain language place a limit on what such a claimant may seek to recover.
Moreover, we discern little reason for distinguishing between (1) the materials price itself; (2) the time-price differential provision, which is related to the materials price; and (3) the attorney fees provision, which also constitutes part of the contract bid. Wyandotte’s decision to actually price materials at a particular level in the contract bid was presumably a function of all the other contract provisions, including those pertaining to the time-price differential and attorney fees. That is, Wyandotte presumably adjusted its materials price downward, at least to some *146 degree, on the assumption that all contract provisions would be given effect, and it would likely have quoted a higher materials price in the bid if it did not have the reasonable assurance that it would be reimbursed at a certain rate for delinquent payments (time-price differential) or for litigation required to satisfy outstanding debt (attorney fees). Accordingly, the attorney fees provision is not detached from the materials price; rather, it and the materials price are interrelated, just as the time-price differential provision and the materials price are interrelated. Given that Wyandotte is entitled to recover the materials price and the time-price differential, we believe Wyandotte is entitled to recover attorney fees as well.
We also note that our conclusion is consistent with how several federal circuits have interpreted the Miller Act. See United States ex rel Maddux Supply Co v St Paul Fire & Marine Ins, 86 F3d 332, 336 (CA 4, 1996) (“The Miller Act does not, by its own terms, provide for attorney’s fees or interest. Several circuits have held, however, that interest and attorney’s fees are recoverable if they are part of the contract between the subcontractor and supplier.”).

 As noted earlier in this opinion, the open-account agreement states that “[i]n the event [ETS’s] account is placed in the hands of an attorney for collection after default, [ETS] agrees to pay 33% of the unpaid balance for attorney’s fees together with applicable costs.”

 Even though the parties have not raised this issue, in his partial dissent Chief Justice Young contends that the attorney fees provision was not triggered before Wyandotte sent its 90-day notice to defendants and, therefore, Wyandotte cannot claim attorney fees. He argues that MCL 129.207 limits a claimant’s potential recovery to the amount unpaid 90 days after supplying the last of the labor or materials in question. This argument fundamentally misunderstands the 90-day provision of MCL 129.207, which merely creates a notice requirement. It does not purport to preclude claimants from recovering damages that accrue after the 90-day notice is served. Chief Justice Young’s partial dissent implicitly recognizes this point by agreeing that the time-price differential is recoverable under the statute—including the amounts that accrued after Wyandotte sent its 90-day notice to KEO on November 1, 2010. This conclusion is made emphatically clear by the first sentence of MCL 129.207, which allows a claimant to seek “the amount, or the balance thereof, unpaid at the time of institution of the civil action,” not the amount unpaid 90 days after the claimant ceased performance.

 Because both the lay and legal dictionary definitions of “render” are substantially similar, we need not determine whether it is a legal term of art or a common term. See Brackett v Focus Hope, Inc, 482 Mich 269, 276; 753 NW2d 207 (2008).

 By contrast, Wyandotte’s action directly against ETS, which ended in a default judgment, was a breach of contract claim. A judgment in such a case could be said to be rendered on the contract.