MORINELLI v PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY

Docket No. 211894. Submitted October 12, 1999, at Lansing. Decided
    August 22, 2000, at 9:00 A.M. Leave to appeal sought.

    Joseph A. Morinelli and Perfusion Associates of Michigan, Inc. (PAM),
        a corporation formed by Morinelli and others, brought an action in
        the Saginaw Circuit Court against Provident Life and Accident
        Insurance Company, seeking to recover under two policies issued
        by the defendant: a disability income policy that personally insured
        Morinelli in the event he suffered a loss resulting from injury or
        sickness, and a business buy-out expense disability policy that
        insured PAM for expenses attributable to a buy-sell agreement
        between PAM and Morinelli if he ever became totally disabled. The
        disability income policy defined "total disability" and "totally dis-
        abled" as meaning that because of injuries or sickness, the insured
        "is not able to perform the substantial and material duties of
        his/her occupation" and "is receiving care by a Physician which is
        appropriate for the condition causing the disability." The action
        was commenced after the plaintiffs alleged that Morinelli was
        totally disabled as a result of diabetes. The court, Patrick M. Meter,
        J., granted summary disposition in favor of Provident with regard
        to the claim by PAM, finding that PAM failed to meet a condition pre-
        cedent for the payment of benefits under the business buy-out
        expense disability policy because there was no buy-sell agreement
        in place until after either of the plaintiffs had filed a claim. Follow-
        ing a jury trial in which Provident presented evidence concerning
        the quality of the treatment rendered by Morinelli's doctor, the jury
        found that Morinelli suffered from a sickness that prevented him
        from performing the substantial and material duties of his occupa-
        tion but did not find that Morinelli received care by a physician
        that was appropriate for the condition of diabetes. The court
        entered a judgment of no cause of action and also denied
        Morinelli's motions for judgment notwithstanding the verdict (JNOV)
        and a new trial. The plaintiffs appealed.

    The Court of Appeals held:

    1. The language found in the disability income policy is not
ambiguous and the phrase "appropriate care" does not require a

qualitative evaluation of the care provided. Care "appropriate for the condition causing the disability" is care that is necessary and causally related to the condition forming the basis of the disability claim. Whether the level of treatment met the standard of care is not pertinent to a determination whether the care was appropriate. The treatment that Morinelli received for his diabetes was appropriate for the condition and, therefore, met the clear language of the policy. The jury erred in concluding that the course of treatment Morinelli received was not appropriate care as contemplated by the policy.

2. Morinelli was denied a fair trial as the result of the admission, over his objection, of testimony by the defendant's expert witness concerning the quality of care rendered by his doctor. The court abused its discretion in allowing such testimony. Morinelli's failure to request a curative instruction was not fatal to his appeal under the circumstances of this case. The order denying JNOV must be reversed and the matter must be remanded.

3. The court properly granted summary disposition in favor of Provident with regard to the claim by PAM. PAM did not have a buy-sell agreement with regard to Morinelli's becoming totally disabled in effect at the time the policy was enacted or when Morinelli filed his claim for disability. PAM therefore failed to meet a condition precedent of the insurance policy. The order of summary disposition with regard to that claim must be affirmed.

Affirmed in part, reversed in part, and remanded.

MARKEY, J. concurring in part and dissenting in part, stated that the trial court did not err in denying Morinelli's motion for JNOV. Appropriate care is care that is within the norm of proper, reasonable, and ordinary care. There is a correlation between the terms "appropriate care" and "standard of care." It is contrary to logic and the obvious wording of the policy for the majority to conclude that "whether the level of treatment met the standard of care is not pertinent to a determination whether the care was appropriate." The court did not abuse its discretion in allowing the defendant's expert witness to testify that if Morinelli had received appropriate care for his condition, he would have been able to return to work. The jury properly found that because Morinelli was not receiving appropriate care, he did not meet the policy's definition of total disability or totally disabled. The orders of the court should be affirmed.

*Hurlburt, Tsiros, Allweil & Perez, P.C.* (by *Lawrence A. Hurlburt*), for the plaintiffs.

*Thomas, DeGrood, Witenoff & Hoffman, P.C.* (by *Gary N. Felty, Jr.,* and *Stephen L. Witenoff*), for the defendant.

Before: KELLY, P.J., and MARKEY and COLLINS, JJ.

KELLY, P.J. Plaintiff Joseph A. Morinelli appeals as of right the judgment entered following a jury trial in this action to enforce two disability insurance policies. Plaintiff Perfusion Associates of Michigan, Inc. (PAM), appeals as of right the trial court's order granting summary disposition in favor of defendant Provident Life and Accident Insurance Company. We reverse in part, affirm in part, and remand.

I

Plaintiff Morinelli is a perfusionist, which is the individual who operates the heart-lung machine, as well as other equipment, to keep a patient alive during open-heart surgery. In April 1990, Morinelli and his partners formed PAM. One year later, they purchased two policies of insurance from defendant: a disability income policy, which personally insured Morinelli in the event he suffered a loss resulting from injury or sickness, and a business buy-out expense disability policy, which insured PAM for any expenses attributable to a buy-sell agreement between the corporation and Morinelli if he ever became totally disabled.

Under the disability income policy, "total disability" is defined as follows:

> Total Disability and totally disabled means that due to Injuries or Sickness, the Insured:

1. is not able to perform the substantial and material duties of his/her occupation; and

2. is receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to the Insured.

In July 1993, Dr. Eugene Calabrese examined Morinelli and diagnosed him as having diabetes. Dr. Calabrese prescribed Glucotrol, an oral medication designed to reduce blood sugar levels, a diet, and exercise. Over time, the Glucotrol was adjusted to the maximum recommended dosage, and, by September 1994, Morinelli needed insulin injections to control the diabetes. At the time, Morinelli was experiencing fatigue, forgetfulness, and frequent urination, all of which compromised his ability to perform as a perfusionist.

On October 24, 1994, Morinelli filed a disability claim, which was supported by Dr. Calabrese's opinion that he was totally disabled. Defendant began paying benefits under its disability income policy, but later terminated the payments, asserting (1) that Morinelli's diabetes had first manifested itself before the issuance of the insurance policies, and (2) that diabetes did not appear to impair his ability to perform the material and substantial duties of his occupation in that the claim was based on an assumption that a diabetic incident would arise and did not allege that Morinelli was unable to perform his duties absent such an incident. The plaintiffs subsequently filed this action asserting breach of contract, as well as other claims not germane to this appeal.

The trial court granted defendant's motion for summary disposition, which sought to rescind the buy-out

expense disability policy because, contrary to representations in the application for insurance, no written agreement existed between PAM, or its principals, and Morinelli. The court found that PAM failed to meet a condition precedent for the payment of benefits under the terms of the policy in that there was no buy-sell agreement in place until after either of the plaintiffs had filed a claim.

At trial, defendant presented evidence concerning the quality of the treatment rendered by Dr. Calabrese. Standard of care testimony was admitted over Morinelli's objection. As specified on the verdict form, the jury found that Morinelli "suffered from a sickness, to wit: diabetes, from June 23, 1995, to the present, that has prevented him from performing the substantial and material duties of his occupation as a perfusionist." The jury did not find that Morinelli "received care by a physician that was appropriate for the condition of diabetes."

The court denied Morinelli's motion for judgment notwithstanding the verdict (JNOV) on the basis of its finding that the evidence was sufficient to support the verdict in that the definition of "total disability" included a finding of "appropriate care." The court ruled that Morinelli could not claim surprise because defendant had raised the issue in its affirmative defenses,[1] in its response to interrogatories,[2] and in

---

[1] As an affirmative defense, defendant stated "[t]hat plaintiff Morinelli is not under the care and treatment of a physician, which is appropriate for the conditions of his disability."

[2] In answer to Morinelli's interrogatory question, "State each opinion to which the expert is expected to testify and a summary of the grounds for each opinion," defendant stated as follows:

Dr. [James] LaFleur will testify consistent with his previous statement given to Provident, which is in the possession of the plaintiff,

its opening statements.[3] Moreover, Morinelli did not raise the issue of the meaning of the phrase "appropriate care" until after the verdict. The court also denied Morinelli's motion for a new trial on the basis of its finding that the policy language was unambiguous. The meaning of the word "appropriate" as used in the policy's medical care clause forms the crux of this appeal.

II

Morinelli (hereafter plaintiff) first argues that the defendant's allegation that the care received by plaintiff was inappropriate in that it did not meet the standard of care was not a proper contractual defense to his claim for disability benefits. Plaintiff argues that the treatment he received for his diabetes was appropriate for the condition and, therefore, met the clear language of the policy. We agree.

We review a trial court's decision with regard to a motion for JNOV de novo. *Meagher v Wayne State Univ*, 222 Mich App 700, 721; 565 NW2d 401 (1997). In reviewing a decision regarding a motion for JNOV, this Court must view the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the nonmoving party. *Forge v Smith*, 458 Mich 198, 204; 580 NW2d 876 (1998). If reasonable jurors could have honestly reached differ-

as well as his response to plaintiff's previous lawyer, regarding Mr. Morinelli's alleged disability. In short, Dr. LaFleur will testify that in his opinion, Mr. Morinelli, notwithstanding his diabetic condition, is perfectly capable of continuing with his profession as a perfusionist, and is therefore not disabled from performing that profession.

[3] In his opening statement, defense counsel emphasized that the word "appropriate" was important, though he did not elaborate.

ent conclusions, the jury verdict must stand. *Severn v Sperry Corp*, 212 Mich App 406, 412; 538 NW2d 50 (1995). The interpretation of contractual language is an issue of law that is also reviewed de novo on appeal. *Morley v Automobile Club of Michigan*, 458 Mich 459, 465; 581 NW2d 237 (1998).

In deciding a motion for a new trial, the trial court's function is to determine whether the overwhelming weight of the evidence favors the losing party. *Phinney v Perlmutter*, 222 Mich App 513, 525; 564 NW2d 532 (1997). This Court must determine whether the trial court abused its discretion in ruling with regard to a motion for a new trial. *Id.* Substantial deference is given to the trial court's conclusion that the verdict was not against the great weight of the evidence. *Id.*

The purpose underlying a policy's medical care clause is that of enabling the insurer to guard against fraudulent claims and to establish the good faith of the claimant. 10 Couch, Insurance, 3d, § 146:25, p 146-53. The insurer's review of the nature of the care concerns whether it is "necessary and causally related" to the alleged disability. *Id.*, p 146-54. Although the medical clause in this policy is under the definition of "total disability," it is actually a requirement or a condition of coverage, and compliance with the condition is an issue distinct from that of the elements of total disability. *Crosby v Prudence Mut Casualty Co*, 252 SC 294; 166 SE2d 201 (1969).

An insurance policy is much the same as another contract; it is an agreement between the parties. *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992); *Moore v First Security Casualty Co*, 224 Mich App 370, 375; 568 NW2d 841 (1997). Any ambiguities in insurance contracts are

liberally construed in favor of the insured and against the insurer, who drafted the contract. *State Farm Mut Automobile Ins Co v Enterprise Leasing Co*, 452 Mich 25, 38; 549 NW2d 345 (1996). This does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefiting an insured. *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 208, n 8; 476 NW2d 392 (1991). The fact that a policy does not define a relevant term does not render the policy ambiguous. *Henderson v State Farm Fire & Casualty Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). This Court must interpret the terms of the contract in accordance with their commonly used meanings. *Group Ins Co of Michigan v Czopek*, 440 Mich 590, 596; 489 NW2d 444 (1992).

The policy at issue in this case does not define the word "appropriate," and no Michigan case has interpreted language similar to that found in defendant's disability policy. The court may refer to dictionary definitions when appropriate when ascertaining the precise meaning of a particular term. *Popma v Auto Club Ins Ass'n*, 446 Mich 460, 470; 521 NW2d 831 (1994). The word "appropriate" is defined as "particularly suitable; fitting; compatible." *Random House Webster's College Dictionary* (2d ed, 1997). Similarly, "appropriate" is defined as "[s]uitable for a particular person, condition, occasion, or place; proper; fitting." *The American Heritage Dictionary: Second College Edition* (1985).

It is this Court's opinion that the language found in the policy is not ambiguous and that "appropriate

care" does not require a qualitative evaluation of the care provided. The policy does not state that to recover benefits under the policy, the insured must receive "appropriate care"; rather, the contract states that the care received must be "appropriate for the condition causing the disability." Care "appropriate for the condition causing the disability" is care that is necessary and causally related to the condition forming the basis of the disability claim. It cannot be disputed that the insured in this case was receiving care from a licensed physician, acting within the scope of his license, that was appropriate to the treatment of diabetes (i.e., instruction on diet and exercise, periodic office visits, and the prescription of insulin). It was Dr. James LaFleur's testimony and defense counsel's closing argument that cast specific doubt on the "appropriateness" of the care that Morinelli received. If this case involved a claim for medical malpractice, a determination of the standard of care and whether that standard was met would surely be in order. This case, however, involves an insured making a claim under his disability policy. As such, whether the level of treatment met the standard of care is not pertinent to a determination whether the care was appropriate.

Regardless of whether Morinelli had forewarning of defendant's plan to argue standard of care issues, we deem the opinion testimony of Dr. LaFleur regarding the care rendered by Dr. Calabrese, as well as defendant's arguments regarding the standard of care, to be beyond the scope of the issues to be decided in an action to enforce a disability insurance contract. Defendant's expert witnesses testified that medication, diet control, and exercise are key elements in treating diabetes. Dr. George Grunberger stated in his

deposition that he had no substantial complaint with how Dr. Calabrese treated Morinelli.[4] Dr. Calabrese was treating Morinelli for his diabetes; the care was an appropriate regimen for the diabetic condition according to the parties and the experts.

Defendant is correct in its assertion that Morinelli had the burden of proving that he was disabled pursuant to the language of the policy. *Forman v Prudential Ins Co of America*, 310 Mich 145, 148; 16 NW2d 696 (1944). It is our opinion that Morinelli met that burden by showing not only that he was unable to perform the substantial and material duties of a perfusionist, but also that he was receiving appropriate care for diabetes at the time the claim was filed. We hold that, in the context of this disability insurance dispute, the jury erred in concluding that the course of treatment Morinelli received was not appropriate care as contemplated by the policy.

III

Morinelli also argues that he was denied a fair trial by the admission, over his objection, of testimony concerning the quality of care rendered by Dr. Calabrese. We agree.

Dr. LaFleur was the last witness to testify. After reviewing Morinelli's medical history and detailing fluctuations in his blood sugar levels and weight, defense counsel posed the following question to Dr. LaFleur:

---

[4] During the deposition of defense witness Dr. Grunberger, plaintiffs' counsel asked whether he had any criticism of Dr. Calabrese. Dr. Grunberger answered "no," although he expressed displeasure with Morinelli's glycohemoglobin count.

*Q:* All right. Now, if you had a patient who had those levels of glycohemoglobin, and if there was a prescription for insulin on October 7, 1994, what would a—what would a—what would the appropriate course of treatment be over the course of time with regard to the glycohemoglobin, the insulin and diet?

Plaintiff objected on the ground that Dr. LaFleur's expert testimony was inconsistent with that represented in defendant's answer to Morinelli's interrogatory regarding the scope of the opinions to be rendered by its experts. Specifically, plaintiff alleged that Dr. LaFleur's testimony was given in violation of MCR 2.302(E)(1)(a)(ii), which states:

(E) Supplementation of Responses.

(1) Duty to Supplement. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information acquired later, except as follows:

(a) A party is under a duty seasonably to supplement the response with respect to a question directly addressed to

\*    \*    \*

(ii) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert is expected to testify, and the substance of the expert's testimony.

It is within the trial court's discretion to sanction a party for violating the discovery rules. MCR 2.302(E)(2). Likewise, a trial court's decision to admit evidence is reviewed for an abuse of discretion. *Dep't of Transportation v VanElslander*, 460 Mich 127, 129; 594 NW2d 841 (1999). We find that the trial court abused its discretion in allowing Dr. LaFleur to

testify regarding the quality of care received by
Morinelli.[5]

Morinelli argued that, on the basis of defendant's
answer to the interrogatory regarding expert testi-
mony, he did not consider it necessary to depose Dr.
LaFleur because he had no idea the doctor would tes-
tify regarding the standard of care. As an offer of
proof, Morinelli stated that he was unprepared to
address criticism of Dr. Calabrese because there was
no indication during discovery that defendant would
suggest that Dr. Calabrese had fallen short of some
undefined standard of care in treating Morinelli's dia-
betes. The trial court agreed.

Nevertheless, Dr. LaFleur was allowed to testify
regarding what treatment would have been successful
in controlling Morinelli's diabetes, and that with all
the various testing methods and new drugs, there was
no reason why Morinelli could not return to normal
workday functions. The trial court attempted to rec-
tify any perceived discrepancies between defendant's
interrogatory answer and Dr. LaFleur's actual testi-
mony. Dr. LaFleur was of the opinion that, if Morinelli
maintained his blood sugar levels through proper
insulin therapy, maintained a steady low-calorie diet,
and took short breaks during long surgeries, he would
be able to perform the duties of a perfusionist.

Although the quality of care testimony could argua-
bly be considered relevant to the first prong of the

---

[5] Dr. Calabrese is board certified in the field of internal medicine and
has received specialized training in the area of diabetes. Dr. LaFleur, on
the other hand, is a family practitioner whose practice includes the treat-
ment of diabetic patients. Had this been a medical malpractice action, Dr.
LaFleur would not have been qualified to give standard of care testimony
against Dr. Calabrese. MCL 600.2169(1)(a); MSA 27A.2169(1)(a).

definition of "total disability," defense counsel's closing argument made clear that the testimony was offered to show that the treatment did not meet the standard of care for diabetic patients. During closing argument, defendant's counsel claimed that contrary to the recognized procedure for treating a diabetic patient's blood sugar levels there had been "[t]otal neglect in the care and treatment of Mr. Morinelli's weight problem." He also stated: "The doctor's not giving the right treatment. There's something seriously wrong."

Defendant's counsel continued:

> They think it's okay. Dr. Calabrese thinks it's okay to bring him down to 11 or 12 from 16 and send the man on his way. And it's absurd. He's killing the man. It's absurd. It's the most inappropriate care I've ever seen. He just—he just says, well, he's gaining weight, and his levels have come down a little bit, so that's fine. Doesn't send him out for a consult, doesn't change anything. It's absurd.

Defendant's counsel added comments that the chosen treatment was "absolutely, totally inappropriate." He emphasized that the fact that the treatment was not succeeding in reducing Morinelli's weight was evidence that "everything [Dr. Calabrese] was doing [was] totally inappropriate." Morinelli did not object or seek a curative instruction.

Defendant argues that this appeal is actually a challenge to the jury instructions not properly before the Court because of Morinelli's failure to object to the instructions We disagree. The pertinent instruction was given to the jury as follows:

> The terms of the disability insurance policy control absent any ambiguity. In considering the definitions of

terms contained in the disability insurance policy, you are to consider these definitions as they would be understood by the ordinary business person or by a reasonable person in the place of the insured.

As instructed by the trial court, the jury was to give the terms of the policy their plain meaning. Looking at this instruction, we believe that Morinelli had no basis to challenge the instruction. Taken in the context of this lawsuit, it is clear that the word "appropriate" can mean only that Morinelli was being treated in a manner consistent with the usual course of treatment for diabetic conditions.

In support of his motion for JNOV, Morinelli's counsel stated that he "never conceived that this policy language could be invoked by the Defendant as a quality of care, as a medical malpractice standard." Under the circumstances of this case, where Dr. LaFleur's testimony was admitted over Morinelli's objection, we find that Morinelli's failure to request a curative instruction is not fatal to his appeal.

The jury's finding that the care rendered by Dr. Calabrese was not appropriate leads us to the inescapable conclusion that the jurors agreed with defendant's theory of the case—as presented by Dr. LaFleur's testimony and in closing argument—that "appropriate care" as used in the policy meant treatment that meets the standard of care for physicians treating patients with diabetes. No evidence supported this conclusion other than the improperly admitted opinion testimony of Dr. LaFleur.

We find that the admission of the quality of care evidence was erroneous and prejudicial, and it injected into the case an issue that was not properly before the jury. Our determination that the second

prong of the "totally disabled" definition does not entail an inquiry into whether the treatment met the standard of care supports a conclusion that the care rendered by Dr. Calabrese was appropriate, that is, necessary and causally related to Morinelli's diabetic condition. The admission of Dr. LaFleur's quality of care testimony constituted an abuse of discretion. We believe that, absent the improperly admitted testimony and defense counsel's heavy reliance on it during closing argument, reasonable jurors would be compelled to find the care rendered by Dr. Calabrese was appropriate for the condition of diabetes, and, consequently, the trial court's order denying JNOV is reversed.

IV

PAM argues that the trial court erred in granting summary disposition in favor of defendant on the ground that PAM's failure to have in place a "buy-sell" agreement when notice of Morinelli's claim was made precluded recovery under the terms of the business buy-out expense disability policy. We disagree.

PAM filed a claim under the business buy-out expense disability policy before defendant terminated payment of benefits to Morinelli under the disability income policy.[6] Defendant denied the claim. The policy provided as follows:

---

[6] As noted by the trial court in its opinion and order granting defendant's motion for summary disposition:

A thorough review of the Court's file fails to disclose the exact date that PAM submitted its claim for business buy-out expense benefits payable under the policy, although it appears Plaintiff Morinelli filed his notice of claim under his individual disability policy on October 24, 1994.

> We will pay benefits to the Loss-Payee for Business Buy-Out Expense if: (a) the insured is an owner of the Business and is engaged in Active Full-Time Work when the Period of Disability starts; and (b) money becomes payable in accordance with the Buy-Sell Agreement because of the Insured's Total Disability.

The policy defined a buy-sell agreement as "a written agreement between the Business and/or its Principals and the Insured. It must provide for the purchase of the Insured's ownership interest in the Business due to his/her Total Disability."

At the time the business buy-out policy was issued, PAM had a shareholder agreement in effect. The agreement stated, in part, as follows:

> Upon a Shareholder's death or termination of employment, the corporation *may* purchase the shares of its stock held by that Shareholder. If the Corporation purchases less that [sic] all of that Shareholder's shares, the other Shareholders may purchase the remaining shares. If all of the shares are not purchased, the Corporation shall be dissolved as soon as possible. [Emphasis added.]

According to the application for the buy-out policy, the following question was presented to Morinelli and PAM, which question was answered in the affirmative:

> Is it understood that a requirement for the payment of policy benefits is that a written agreement must be in effect between the Business and/or its Principals and the Insured covering the purchase of the Insured's ownership interest in the Business because of Total Disability of the Insured?

---

. . . Therefore, it can reasonably be inferred that PAM submitted its claim to Defendant under the provisions of the policy prior to June 23, 1995.

It was not until November 1995 that Morinelli and PAM entered into a stock redemption agreement whereby PAM agreed to buy back Morinelli's stock because of his total disability.[7] As such, PAM did not have a buy-sell agreement with regard to Morinelli becoming totally disabled in effect at the time the policy was enacted or when Morinelli filed his claim for disability. The trial court granted defendant's motion for summary disposition because the buy-sell agreement was created well after either plaintiff had submitted a claim to defendant. Consequently, the trial court did not err in granting summary disposition in favor of defendant with regard to PAM's claim under the buy-out expense disability policy because PAM failed to meet a condition precedent of the insurance policy.

Reversed with regard to the trial court's denial of Morinelli's motion for JNOV and affirmed with regard to the trial court's order granting summary disposition of PAM's claim. Remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

COLLINS, J., concurred.

MARKEY, J. (*concurring in part and dissenting in part*). I respectfully dissent in respect to the majority's decision to reverse the trial court's order denying Joseph Morinelli's (hereafter plaintiff) motion for judgment notwithstanding the verdict (JNOV).

As the majority notes, *ante* at 260-261, in reviewing a decision regarding a motion for JNOV, "[i]f reasona-

---

[7] The agreement called for PAM to purchase Morinelli's stock at $900 a share as opposed to the $1 a share price outlined in the shareholder agreement.

ble jurors could have honestly reached different conclusions, the jury verdict must stand." Further, this Court must view all the evidence in a light most favorable to the nonmoving party, i.e., defendant in the present case. *Severn v Sperry Corp*, 212 Mich App 406, 412; 538 NW2d 50 (1995). After applying these standards to this case, I cannot agree that the trial court erred in denying plaintiff's motion for JNOV. In order to reach its conclusion that the trial court should have granted plaintiff's motion for JNOV, the majority has to make several preliminary findings. Then, using these findings, the majority sets in action a "domino effect" resulting in its conclusion that the jury's determination was unreasonable. First, the majority concludes that the testimony of Dr. James LaFleur was improperly admitted opinion testimony. To make this determination, this Court must find that the trial court abused its discretion in admitting the testimony. *Dep't of Transportation v VanElslander*, 460 Mich 127, 129; 594 NW2d 841 (1999). For this Court to find an abuse of discretion, we must find that the trial court's decision is " 'so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.' " *Dacon v Transue*, 441 Mich 315, 329; 490 NW2d 369 (1992), quoting *Spalding v Spalding*, 355 Mich 382, 384-385; 94 NW2d 810 (1959).

Because the majority has decided that JNOV should have been granted on the basis of the improper admission of Dr. LaFleur's testimony, I will first address that issue. Without question, the disability insurance contract required plaintiff to prove two

requirements: first, that he was unable to perform the "substantial and material duties of his occupation" as a perfusionist, and, second, that he was "receiving care by a Physician which [was] appropriate for the condition causing the disability." Here, because we have the benefit of a special jury verdict form, we know that the jury did, indeed, find that plaintiff was so ill that he was unable to perform the substantial and material duties of his occupation, thereby satisfying the first prong of the condition set forth by the insurance disability contract. On the other hand, we also know that the jury found that plaintiff was *not* receiving care "appropriate for the condition" causing his disability, i.e., diabetes. The jury had received a specific instruction setting forth these two prongs and properly allocating the burden of proof to plaintiff. I agree with defendant that plaintiff cannot on one hand agree that he had the burden of proving his disability as set forth in the policy and as the jury was instructed, but then on the other hand also argue that defendant could not attempt to demonstrate that plaintiff was not, in fact, receiving "appropriate care" for his diabetic condition.

I also do not believe that the phrase "care by a Physician which is appropriate for the condition causing the disability" is in any way ambiguous. The majority agrees that this language is not ambiguous and that "appropriate care" means "care that is necessary and causally related to the condition forming the basis of the disability claim." *Ante* at 263. Where I split with the majority's analysis is that they also conclude that this does not mean that the treatment must comply with the appropriate and applicable standard of medical care. If, however, one accepts that the word

"appropriate" is *defined* as "particularly suitable; fit-
ting; compatible," *Random House Webster's College
Dictionary* (2d ed, 1997), and as "[s]uitable for a par-
ticular person, condition, occasion, or place; proper;
fitting," *The American Heritage Dictionary: Second
College Edition* (1985), and compares it to the defini-
tion of standard of care; I believe one *must* conclude
that "appropriate care" is care that is within the norm
of proper, reasonable, and ordinary care. Although I
do not and need not conclude here that the term
"appropriate care" is completely synonymous with
"standard of care" treatment, I do believe that there is
correlation between the two.

The definition for standard of care in a medical
malpractice case varies somewhat depending on
whether the treatment at issue was provided by a
general or specialized physician. MCL 600.2912a(1);
MSA 27A.2912(1)(1). For example, in an action alleg-
ing medical malpractice against a specialist, the plain-
tiff must prove that in light of the state of art existing
at the time of the alleged malpractice, the specialist
"failed to provide the recognized standard of practice
or care within that specialty as reasonably applied in
light of the facilities available in the community or
other facilities reasonably available under the circum-
stances . . . ." MCL 600.2912a(1)(b); MSA
27A.2912(1)(1)(b). Thus, for the majority to conclude,
*ante* at 263, that "whether the level of treatment met
the standard of care is not pertinent to a determina-
tion whether the care was appropriate" is simply con-
trary to both logic and the obvious wording of the
contract at issue.

In respect to Dr. LaFleur's testimony, I do not
believe that the trial court abused its discretion in

allowing his testimony. Again, I concur with defendant in that the only issue preserved here is whether Dr. LaFleur's testimony should have been excluded as a sanction for failure to supplement answers to interrogatories. Plaintiff does, indeed, claim that he was surprised at trial because he did not expect Dr. LaFleur to testify regarding "quality of care." In reviewing the answer to the interrogatory at issue, I understand how plaintiff may have been somewhat "sandbagged" by Dr. LaFleur's testimony. Nonetheless, the interrogatory *did* highlight the fact that Dr. LaFleur was going to testify that Mr. Morinelli was not disabled. As already noted and agreed on by all the parties, the contract set forth two requirements that plaintiff must establish in order to be deemed disabled under the policy. Part of the definition is, of course, that at issue: whether plaintiff was receiving "appropriate care." Specifically, Dr. LaFleur testified that had plaintiff been receiving appropriate care for his condition, he would have been able to return to work. In other words, under the unambiguous wording of the disability insurance contract, the jury appropriately found that because plaintiff was not receiving appropriate care, he did not meet the definition of total disability or totally disabled. Because plaintiff had the burden of proof regarding the entire definition of disability, he cannot complain now that the jury did not find that he met his burden of proof. Dr. LaFleur's testimony was relevant to an important issue of the trial, and the substance of it was sufficiently identified in the answers to interrogatories so that an abuse of discretion, in my opinion, cannot be found. The jury's finding was in no respect "unreasonable," nor was the court's initial decision to admit the

testimony " 'so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.' " *Dacon, supra* at 329, quoting *Spalding, supra* at 384-385.

I also note that in addition to Dr. LaFleur's testimony questioning the appropriateness of plaintiff's treatment for his diabetes, other physicians, specifically Dr. George Grunberger, an internist, also opined that he did not believe plaintiff's diabetes was well controlled and that he believed a failure in his treatment would likely disable him from his occupation. So, again, the appropriateness of plaintiff's care for his diabetic condition obviously interrelates with whether he was able to perform his functions and duties as a perfusionist.

The majority, *ante* at 264, concludes that "the jury erred in concluding that the course of treatment Morinelli received was not appropriate care as contemplated by the policy." Again, this finding is inadequate for a determination that the trial court erred in failing to grant plaintiff's motion for JNOV. Certainly the testimony in this case was such that reasonable minds could differ with regard to whether plaintiff met his burden of proof. That is the case even *if* Dr. LaFleur's testimony were omitted. We are legally able to conclude that a JNOV was required when *all* evidence and legitimate inferences being viewed in a light most favorable to defendant fail to establish a claim as a matter of law. *Phinney v Perlmutter*, 222 Mich App 513, 524-525; 564 NW2d 532 (1997). This high hurdle, in my opinion, was simply not met, and the majority is unfortunately and impermissibly sub-

stituting its own judgment as trier of fact. This is an inappropriate role for an appellate court.

For these reasons, I would affirm with regard to both issues.