# STATE OF MICHIGAN

# COURT OF APPEALS

KIERON SWEENEY and 0730985 BC LTD,

        Plaintiffs-Appellants,

v

VISALUS, INC,

        Defendant-Appellee.

UNPUBLISHED
December 19, 2017

Nos. 334509; 337612
Oakland Circuit Court
LC No. 2015-145497-CB

Before: TALBOT, C.J., and BORRELLO and RIORDAN, JJ.

PER CURIAM.

In Docket No. 334509, plaintiffs appeal as of right the trial court's order granting defendant's motion for summary disposition under MCR 2.116(C)(10), denying plaintiffs' cross-motion, and thereby dismissing plaintiffs' complaint for breach of an independent promotership contract. In Docket No. 337612, plaintiffs appeal as of right the trial court's order awarding defendant case evaluation sanctions of $51,835.07 against both plaintiffs. For the reasons set forth in this opinion, we affirm in part and reverse in part the trial court's order granting summary disposition, vacate the order awarding case evaluation sanctions, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Defendant sells nutrition and fitness products through a multi-level marketing (MLM) structure. In the MLM structure, the company contracts with independent promoters (IPs), also known as independent distributors (IDs),[1] who in turn contract with other IPs to form a "downline" of distributors. Each IP earns a commission from its own sales and from the sales of IPs in its downline. In 2010, R. J. Barros recruited plaintiff Sweeney as an IP. Sweeney recruited for his downline from a "following" of persons he knew from his activities as a seminar presenter and business coach. Sweeney attained the status of a "2 Star Ambassador" in defendant's marketing structure. Effective January 15, 2013, Sweeney changed his account

---

[1] The parties interchangeably use the terms "independent distributor" (ID) and "independent promoter" (IP). For consistency, we will use the "IP" designation in this opinion, except when referring to evidence or testimony in which the term "ID" is specifically used.

status from personal to corporate by enrolling his corporation, 0730985 B.C., Ltd., as an IP. The corporation assumed Sweeney's personal account number. 0730985 B.C., Ltd. is also a plaintiff in this case.

In September 2013, Justin Call, defendant's vice president and a member of defendant's Compliance Committee, and Eileen LeGall, defendant's compliance manager, placed plaintiffs on suspension and froze their IP account based on reports that Sweeney was attempting to recruit members of plaintiffs' downline for Sweeney's other business ventures. In February 2014, Call decided that plaintiffs could resume their IP activities, but Call and LeGall were not entirely satisfied that Sweeney's recruitment activities were acceptable. In March and April 2014, Sweeney communicated with Call regarding the unfreezing of his account and payment of commissions accrued during the period of suspension. Sweeney was dissatisfied with the delay in plaintiffs' reinstatement. In e-mails to defendant's legal counsel, Adam Morgan, Sweeney warned that he would seek legal action against defendant if his reinstatement was not finalized. Morgan and Call decided to terminate plaintiffs' IP agreement. Sweeney was orally informed of the termination decision, but subsequently acknowledged the termination in written communications.

Plaintiffs filed this action asserting claims for breach of contract and unjust enrichment. Plaintiffs' contract claim was based on a provision in the Terms of Agreement of a standardized IP Agreement that Sweeney and defendant executed in 2010. Paragraph 5 of the Terms of Agreement stated:

> 5. I may terminate this Agreement for any reason, at any time, by giving VISALUS prior written notice. VISALUS may terminate this Agreement in writing upon violation of policies and procedures in the event I violate any part of this Agreement. In such event, no further commissions will be paid by VISALUS. To terminate this Agreement, I must mail or deliver personally to VISALUS, signed, dated, written notice of cancellations sent to VISALUS SCIENCES . . . .

Paragraph 13 stated:

> 13. I will not make any false or misleading statements about VISALUS or its marketing program. I agree that I will operate in a lawful, ethical and moral manner and will not engage in or perform any misleading, deceptive or unethical practices. In the event I violate any of these conditions, my position may be terminated without further payment or compensation of any kind.

Defendant moved for summary disposition on three grounds: (1) that it revoked any just-cause termination policy in a revised Policies & Procedures Manual that it issued in 2011; (2) that plaintiffs established a new contract, without a just-cause provision, when Sweeney executed the IP Agreement on the corporation's behalf in 2013; and (3) that the just-cause provision in the 2010 IP Agreement was subject to a "best-judgment" provision, which was included in both the 2010 and 2011 Policies & Procedures Manuals. The "best-judgment" provision stated:

> ViSalus conducts business in an ethical and credible manner, and expects all ID's to work ethically with their customers, with each other, and with the company. ViSalus permits no unethical activity and ViSalus will intervene when unethical behavior is evident. ViSalus reserves the right to use its best judgment in deciding whether certain ID activities are unethical and if determined so, are grounds for terminating or deactivating the ID position. If for any reason an ID violates any of the terms of the Agreement and/or these Policies and Procedures, ViSalus reserves the right to immediately deactivate or terminate the ID's position. Such action by ViSalus will terminate any and all rights of the ID and any further payments of any kind and is effective at the time of said violation.

Plaintiffs filed a cross-motion for summary disposition. Plaintiffs denied that they ever received notice of the 2011 Manual. They argued that the 2013 IP Agreement was merely a transfer of the IP from Sweeney to the corporation, without any modification of the parties' rights and obligations under the 2010 IP Agreement.

The trial court determined that there were genuine issues of fact pertaining to the distribution of the 2011 Manual and the effect of the 2013 IP Agreement, however, the trial court found that defendant was entitled to summary disposition on the ground that the best-judgment provision in the 2010 Manual precluded judicial review of defendant's decision to terminate the IP Agreement. Accordingly, the trial court granted defendant's motion for summary disposition. The trial court subsequently granted defendant's motion for case evaluation sanctions under MCR 2.403(O) and rejected plaintiffs' argument that sanctions could not be imposed on Sweeney individually.

## II. DOCKET NO. 334509

Regarding Docket No. 334509, the salient argument advanced by plaintiffs is that the trial court erred in concluding that defendant's decision to terminate the IP Agreement is not subject to review pursuant to the best-judgment provision in the 2010 Manual. Defendant counters that this Court's decision in *Thomas v John Deere Corp*, 205 Mich App 91; 517 NW2d 265 (1994) mandates that we affirm the trial court's grant of summary disposition.

### A. STANDARD OF REVIEW

"A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) when the affidavits or other documentary evidence, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). The trial court's grant or denial of a motion for summary disposition is reviewed de novo "to determine if the moving party is entitled to judgment as a matter of law." *Id*. at 5-6. The trial court's interpretation of a contract also is reviewed de novo. *Citizens Ins Co v Secura Ins*, 279 Mich App 69, 72; 755 NW2d 563 (2008).

### B. BEST-JUDGMENT PROVISION

"A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of

obligation." *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 508; 885 NW2d 861 (2016) (citation and quotation marks omitted). "A contract must be interpreted according to its plain and ordinary meaning." *Ally Fin, Inc v State Treasurer*, 317 Mich App 316, 329; 894 NW2d 673 (2016). "Courts should construe contracts so as to give effect to every word or phrase as far as practicable." *Barton-Spencer v Farm Bureau Life Ins Co of Mich*, 500 Mich 32, 40; 892 NW2d 794 (2017) (citation and quotation marks omitted). "[C]ontract interpretations that would render any part of the contract surplusage or nugatory must be avoided." *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 694; 818 NW2d 410 (2012) (citations omitted). "A contractual term is ambiguous on its face only if it is equally susceptible to more than a single meaning." *Barton-Spencer*, 500 Mich at 40. "[S]eparate agreements are treated separately. However, when parties enter into multiple agreements relating to the same subject-matter, we must read those agreements together to determine the parties' intentions." *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 148; 881 NW2d 95 (2016). Regarding ambiguity in contracts, this Court stated in *Meagher v Wayne State Univ*, 222 Mich App 700, 721-722; 565 NW2d 401 (1997) (citations omitted):

> Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous.

Resolution of this issue turns on which of the following contractual provisions apply and how they should be interpreted:

- Paragraph 5 of the 2010 IP Agreement, which states that defendant "may terminate this Agreement in writing upon violation of policies and procedures in the event I violate any part of this Agreement."

- Paragraph 13 of the 2010 Terms of Agreement, which provides that an IP's engagement in misleading, deceptive, or unethical practices is grounds for termination.

- Paragraph 20 of the 2010 Terms of Agreement, which incorporates by reference the Policies & Procedures Manual and provides that "changes thereto shall be effective upon verbal or written notice to me and become a binding part of this Agreement."

- The 2010 Manual, p 6, which states that "ViSalus reserves the right to use its best judgment in deciding whether certain ID activities are unethical and if determined so, are grounds for terminating or deactivating the ID position."

- Section VI of the 2011 Manual, p 5, which states that "ViSalus reserves the right to use its best judgment in deciding whether certain IP activities are unethical and if determined so, are grounds for terminating or deactivating the IP position."

- The anti-spamming provisions in the 2010 and 2011 Manuals, which prohibit spamming, defined as advertising "goods or services posted to a message board against stated policy, sent to someone without prior consent, or sent in the absence of a previous relationship."

- The "Suspension" provision in the 2010 Manual, and the "Frozen Accounts/Suspension" provision in the 2011 Manual, which follow the section on spamming.

- The "IP Account Termination" provisions in the 2010 and 2011 Manual following the spamming provision.

- The 2011 Manual's section on "Independent Promoter Terms of Agreement, which provides that either party may terminate the agreement "for any reason, at any time, by giving the other party written notice."

- Paragraph 5 of the Terms of Agreement stated on the reverse side of the 2013 IP Agreement, which provides that either party may terminate the agreement "for any reason, at any time . . . ."

In *Toussaint v Blue Cross & Blue Shield of Mich*, 408 Mich 579; 292 NW2d 880 (1980), our Supreme Court acknowledged that contracts of indefinite duration are generally terminable by either party's will. *Id*. at 611. The Court held, however, that there was "no public policy against providing job security or prohibiting an employer from agreeing not to discharge except for good or just cause." *Id*. The Court held that "a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable," and that "such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements." *Id*. at 598. In *In re Certified Question*, 432 Mich 438; 443 NW2d 112 (1989), our Supreme Court held that a just-cause employment policy is revocable, provided the employer gives reasonable notice of the change to affected employees. The Court stated, "Fairness suggests that a discharge-for-cause policy announced with flourishes and fanfare at noonday should not be revoked by a pennywhistle trill at midnight." *Id*. at 454-457. Plaintiffs argue that pursuant to *Toussaint*, defendant is bound by the provision in the 2010 Terms of Agreement limiting defendant's authority to terminate an IP absent a violation of defendant's Policies and Procedures.

In *Thomas v John Deere Corp*, 205 Mich App at 91-92, the plaintiff was employed by the defendant as a territorial manager. In May 1990, plaintiff received an adverse performance review. The defendant gave him a list of objectives to accomplish in the following six months. In November 1990, the plaintiff's supervisor terminated his employment with the explanation that the plaintiff failed to satisfy the defined objectives. The plaintiff brought an action for wrongful discharge, in which he alleged that his employment contract was terminable only for just cause. *Id*. At 92. The trial court granted summary disposition on the ground that the plaintiff failed to establish a genuine question of fact that his employment contract required just cause for termination. *Id*. On appeal, this Court held:

> [P]laintiff contends that he presented sufficient evidence of a just-cause contract to avoid summary disposition. Under our Supreme Court's decision in *Rood v*

*General Dynamics Corp*, 444 Mich 107, 119-127; 507 NW2d 591 (1993), it is clear that plaintiff did not. Plaintiff's evidence was quite similar to the evidence presented by Mr. Schippers[2] in his companion case in *Rood*, and our Supreme Court held that that evidence was insufficient. *Id.* at 127. However, because it strikes us that calling defendant an at-will employer ignores reality, we think further comment is in order. [*Thomas*, 205 Mich App at 93.]

This Court then reviewed the history of *Toussaint* and its progeny, remarking that these cases reinforce "the fundamental proposition that parties to an employment contract are free to bind themselves to whatever termination provisions they wish." *Id*. at 93-94. This Court stated:

> Consequently, it is somewhat misleading to talk about employment contracts as being either "at-will" or "just-cause." In some employment contracts, employers choose to retain unfettered discretion to terminate an employee's employment when doing so would not violate the law. In other employment contracts, employers agree to limit their discretion to terminate an employee's employment in some way. Employers and employees are free to bind themselves as they wish, and "at-will" and "just-cause" termination provisions are merely extremes that lie on opposite ends of the continuum of possibilities. [*Id*. at 94.]

This Court stated that the case before it "involves an employment contract that lies between the two extremes." *Id*. at 94. This Court recognized that the plaintiff "produced evidence from which it is possible to conclude that defendant had imposed a contract that did limit its discretion to terminate plaintiff's employment." *Id*. at 94. The plaintiff's supervisor "admitted that every employee of defendant could be fired only for good and just cause." The "[d]efendant held itself out to all its employees, including plaintiff, as a company that would terminate employment only for cause, and it never made any statement that would suggest that it reserved for itself the discretion to terminate employment absent good and just cause." *Id*. at 94. However, this Court also remarked that "the same evidence relied on to demonstrate that defendant had limited its ability to terminate plaintiff's employment also establishes that defendant reserved for itself sole authority to decide whether termination was justified." *Id*. at 95. This Court explained:

---

[2] Joseph Schippers, the plaintiff in the companion case to *Rood*, argued that statements by his supervisors created a reasonable expectation that he could not be discharged absent just cause. The general manager, Roy Overway, told Schippers that "as far as he was concerned, unless something was really wrong, [Schippers] would be there for retirement." His immediate supervisor, Larry Bozik, made the comment "that as long as [the division] had a truck, [plaintiff] would be the driver." *Id*. at 120. However, the defendant's handbook contained a disclaimer stating that the defendant's "plans, policies and procedures described here . . . are not conditions of employment," and that the defendant "reserves the right to modify, revoke, suspend, terminate, or change any or all such plans, policies, or procedures, in whole or in part, at any time, with or without notice." *Id*. at 121. Our Supreme Court held that the supervisors' oral statements did not establish just-cause employment because, in context, they were referring to the defendant's plan to continue its trucking function. *Id*. at 123-124.

Defendant would terminate plaintiff only for good and just cause. The decision whether good and just cause existed would be made by plaintiff's supervisor, his supervisor's superior, and a personnel representative.

Thus, despite defendant's alleged agreement to terminate plaintiff only for cause, as long as the determination that just cause existed was made by the designated personnel, it is not possible for plaintiff to state a claim that defendant breached plaintiff's employment contract by terminating his employment. [*Id*. at 95-96.]

In a footnote, this Court commented:

This decision-making approach protects defendant's employees from some risks that truly at-will employees face, such as being fired rashly in a fit of pique, and being fired only because of a personality conflict with an immediate supervisor that does not affect job performance. [*Id*. at 95 n 1.]

At issue in this matter is whether the following language from Section VI of defendant's Manual which addresses unethical conduct and prohibited conduct by IPs mirror the language relied on by this court in *Thomas*. Section VI reads:

ViSalus conducts business in an ethical and credible manner, and expects all IP's to work ethically with their customers, with each other, and with the company. ViSalus permits no unethical activity and ViSalus will intervene when unethical behavior is evident. **ViSalus reserves the right to use its best judgment in deciding whether certain IP activities are unethical and if determined so, are grounds for terminating or deactivating the IP position. If for any reason an IP violates any of the terms of the Agreement and/or these Policies and procedures, ViSalus reserves the right to immediately deactivate or terminate the IP's position. Such action by ViSalus will terminate any and all rights of the IP and any further payments of any kind and is effective at the time of said violation.** (Emphasis added).

From the outset we make clear our rejection of plaintiffs' argument that *Thomas* is not relevant to the IP agreement between plaintiffs and defendant because *Thomas* has not been applied outside the employment context. Because "employment contracts are interpreted the same as other contracts," *Bruno v Detroit Institute of Technology*, 36 Mich App 61, 64; 193 NW2d 322 (1971), this is not a basis for distinguishing *Thomas*.

Plaintiffs next argue that the pertinent statements in *Thomas* are nonbinding dicta and should not be followed. "Dictum is a judicial comment that is not necessary to the decision in the case." *Pew v Mich State Univ*, 307 Mich App 328, 334; 859 NW2d 246 (2014). Although this Court in *Thomas* agreed that the plaintiff failed to present sufficient evidence of a just-cause contract, it offered "further comment" regarding the at-will/just-cause employment continuum. *Thomas*, 205 Mich App at 93. This Court stated that further explanation was warranted because "calling defendant an at-will employer ignores reality." *Id*. This Court qualified its statement that the plaintiff failed to produce sufficient evidence of just-cause employment by stating:

Plaintiff had not been explicitly promised that he could be fired only for just cause. Like most people, he did not negotiate about job security with his employer, he simply accepted employment at whatever terms defendant chose to impose.

Plaintiff has produced evidence from which it is possible to conclude that defendant had imposed a contract that did limit its discretion to terminate plaintiff's employment. Plaintiff's supervisor admitted that every employee of defendant could be fired only for good and just cause. Defendant's internal policies all take the same position. Defendant held itself out to all its employees, including plaintiff, as a company that would terminate employment only for cause, and it never made any statement that would suggest that it reserved for itself the discretion to terminate employment absent good and just cause. [*Id*. at 94.]

This Court further explained:

[T]he same evidence relied on to demonstrate that defendant had limited its ability to terminate plaintiff's employment also establishes that defendant reserved for itself sole authority to decide whether termination was justified. Defendant would terminate plaintiff only for good and just cause. The decision whether good and just cause existed would be made by plaintiff's supervisor, his supervisor's superior, and a personnel representative. [*Id*. at 94-95.]

Finally, this Court concluded:

Because defendant had reserved for itself the authority to determine whether there was good and just cause, and because defendant had, in the manner provided by the alleged employment contract, determined that there was good and just cause for terminating plaintiff's employment, terminating plaintiff's employment was not a breach of that contract. We are not saying that there was just cause to terminate plaintiff's employment. We are only saying that the particular employment contract alleged by plaintiff does not give courts the authority to second-guess defendant's determination. [*Id*. at 95.]

This Court thus explained that the employer's reservation of "sole authority to decide whether termination was justified" precluded the plaintiff from seeking a judicial determination of whether the plaintiff was fired without justification, notwithstanding the statements in the defendant's internal policies and the supervisor's testimony that employees could be fired only for good and just cause. Reading *Thomas* as a whole, we conclude that this explanation is indispensable to the Court's conclusion that the plaintiff failed to establish a triable question of fact. Accordingly, the statements in *Thomas* regarding the employer's reservation of sole authority are not dicta.

Plaintiffs also argue that the *Thomas* analysis does not apply because the language that "reserves [defendant's] right to use its best judgment in determining whether certain IP activities

are unethical" has a different meaning than the phrase "sole authority to decide whether termination was justified."

The 2010 Terms of Agreement states, in relevant part: that defendant: "may terminate this Agreement in writing upon violation of policies and procedures . . . ." The 2010 Terms of Agreement also provide that engagement in misleading, deceptive, or unethical practices also constitute grounds for termination. Finally, the 2010 Terms of Agreement incorporates by reference the Policies & Procedures, including any modification of the Policies & Procedures. The 2010 Manual states that defendant "reserves the right to use its best judgment in deciding whether certain ID activities are unethical and if determined so, are grounds for terminating or deactivating the ID position." The 2010 Manual lists seven examples of unethical activity, but also states that unethical activity is not limited to these examples. The allegations against plaintiffs do not implicate any of the listed examples. However, the 2010 Manual states an open-ended prohibition of unethical activities and "reserves" for defendant "the *right* to use *its best judgment* in deciding whether certain ID activities are unethical" and also in deciding whether those activities "are grounds for terminating or deactivating the IP position." Plaintiffs argue: (1) that defendant's "best judgment" is restricted to specifically named policies; (2) that the term "reserves" refers only to future action and does not give defendant any authority at the time the agreement is consummated.

Plaintiffs contend that the phrase "reserves the right" refers to merely "a statement of intent to do something in the future, i.e., use its best judgment."

A court may "refer to dictionary definitions when appropriate when ascertaining the precise meaning of a particular term." *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 262; 617 NW2d 777 (2000). The definition of "judgment" as stated in *Merriam-Webster's Collegiate Dictionary, Eleventh Edition* (2014), includes this relevant definition: "4a: the process of forming an opinion or evaluation by discerning and comparing b: an opinion or estimate so formed." *Black's Law Dictionary* (10th ed), includes these definitions:

> **1.** The mental faculty that causes one to do or say certain things at certain times, such as exercising one's own discretion or advising others; the mental faculty of decision making.
>
> **bad judgment.** The failure to exercise good judgment; esp., a tendency to do or say the wrong thing or exercising discretion unwisely. – Also termed *unsound judgment*.
>
> **good judgment**. The mental faculty that causes one to do or say the right thing at the right time. – Also termed *sound judgment*. [Emphasis in the original.]

The phrase that defendant "reserves *the right* to use *its* best judgment" indicates that defendant did not intend for any other authority to review whether its decision was prudent. *Black's Law Dictionary* (10th ed) offers pertinent definitions of the terms "right" and "reservation." The term "right" is defined as follows:

2. Something that is due to a person by just claim legal guarantee, or moral principle. 3. A power, privilege, or immunity secured to a person by law. . . . 4. A legally enforceable claim that another will do or will not do as a given act; a recognized and protected interest the violation of which is a wrong.

The term "reservation" is defined as: "1. A keeping back or withholding. 2. That which is kept back or withheld." In consideration of these definitions, and the possessive word "its" in the phrase "[defendant] *reserves* the *right* to use *its best judgment*," it follows that defendant retained the power to determine whether an IP engaged in unethical behavior and whether that behavior warranted termination. Accordingly, we are not persuaded by plaintiffs' argument that the defendant's reservation of "the right to use its best judgment" is materially distinct from the employer's "sole authority" in *Thomas*. Properly construed, the Policies & Procedures allow defendant full discretion to determine if an IP's conduct is unethical and warrants termination.

We also disagree with plaintiffs' argument that this interpretation of the IP Agreement violates public policy.[3] Plaintiffs cite *Suchodolski v Mich Consol Gas Co*, 412 Mich 692; 316 NW2d 710 (1982), in support of their argument that defendant violated public policy by declaring Sweeney's threats of litigation to be unethical. In *Suchodolski*, the plaintiff alleged in his wrongful discharge action that he was terminated in retaliation for reporting poor internal management within the defendant employer. *Id*. at 693-694. This Court stated that Michigan recognizes an exception to the general rule of at-will employment in which "grounds for discharging an employee are so contrary to public policy as to be actionable." *Id*. at 695. "Most often these proscriptions are found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Id*. Sweeney's assertion of his right as an independent contractor to file a lawsuit to assert rights under a private contract does not qualify as exercising a statutory right or duty. Viewing the evidence in a light most favorable to plaintiffs, terminating plaintiffs' IP because Sweeney antagonized other IPs and corporate managers is not "so contrary to public policy as to be actionable."

In sum, the Terms of Agreement in the 2010 IP Agreement executed by Sweeney incorporated by reference the 2010 Manual and future modifications to defendant's Policies & Procedures. The Policies & Procedures provided that specified activities were unethical, but also

---

[3] Additionally, plaintiffs also rely on *City of Novi v Woodson*, 251 Mich App 614; 651 NW2d 448 (2002), a case in which the plaintiff city exercised its right of eminent domain to seize property owned by the defendants. The issue in *Woodson* was whether the act of reserving rights to sue constituted an exercise of such rights within the statutory limitations period. By contrast, the issue in the instant case is whether the language "ViSalus reserves the right to use its best judgment in deciding whether certain IP activities are unethical . . . ." allowed defendant to determine in the future that an IP's activity, not specifically prohibited by the Terms of Agreement and/or Policies & Procedures, was ethical. This is not the same issue presented in *Woodson*, and accordingly we are not persuaded by plaintiffs' arguments.

reserved to defendant the right to use its best judgment to determine that other activities were unethical, and grounds for suspension, deactivation, or termination of the IP account. Defendant's use of its "best judgment" meant that defendant acted within its authority when it determined that Sweeney's solicitation activities and threats of litigation were unethical conduct warranting termination. Accordingly, plaintiffs have not established a genuine question of material fact relating to the contractual promise of what they characterize as "just-cause employment." Predicated on the plain meaning of the relevant language employed by defendant, the trial court correctly concluded that defendant reserved solely to itself the right to determine whether an IP engaged in unethical conduct warranting termination. Accordingly, the trial court did not err in granting defendant's motion for summary disposition on this basis.[4]

## C. CONTRACTUAL REQUIREMENT OF WRITTEN NOTICE OF TERMINATION

Plaintiffs next argue that defendant failed to effectively terminate the IP Agreement because plaintiffs were not notified of the termination in writing, as required by the Terms of Service. Plaintiffs contend that they are therefore entitled to commissions on the downline's sales since Sweeney's suspension.

In *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372-373; 666 NW2d 251 (2003), our Supreme Court stated:

> [I]t is well established in our law that contracts with written modification or anti-waiver clauses can be modified or waived notwithstanding their restrictive amendment clauses. This is because the parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed.
>
> However, the freedom to contract does not authorize a party to *unilaterally* alter an existing bilateral agreement. Rather, a party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract. . . . This principle follows from the contract formation requirement that is elementary to the exercise of one's freedom to contract: mutual assent.
>
> Where mutual assent does not exist, a contract does not exist. Accordingly, where there is no mutual agreement to enter into a new contract modifying a previous contract, there is no new contract and, thus, no modification. Simply put, one cannot unilaterally modify a contract because by definition, a unilateral modification lacks mutuality. [Citation omitted.]

---

[4] Given our conclusion, it is unnecessary for this Court to address defendant's alternative arguments for affirmance.

Both parties indicated by their conduct that plaintiffs had actual notice that plaintiffs were effectively terminated, notwithstanding the omission of written notice. Sweeney stated in an e-mail, dated May 20, 2014:

> I am aware that there are other reports that you have yet to share with me. However at no time did you use any of those allegations to support your suspension. And as you concluded by terminating me because I intimated a legal process which is my right, ViSalus has terminated me without cause and has disrupted my ability to continue earning my residuals over a longer period of time.

Plaintiffs never indicated to defendant that they considered oral statements concerning their termination to be ineffective, and they acknowledged in writing their awareness that they had been terminated. Plaintiffs did not undertake any actions inconsistent with termination. Accordingly, we reject this claim of error.

## D. PLAINTIFFS' ENTITLEMENT TO POSTTERMINATION COMMISSIONS

Plaintiffs next argue that they are entitled to continuing commissions for the downline's sales under the procuring cause doctrine. "The law in Michigan is that sales agents are entitled to posttermination commissions for sales they procured during their time at the former employer." *KBD & Assoc, Inc v Great Lakes Foam Technologies, Inc*, 295 Mich App 666, 673; 816 NW2d 464 (2012). "The procuring-cause doctrine applies when the parties have a contract governing the payment of sales commissions, but the contract is silent regarding the payment of posttermination commissions." *KBD*, 295 Mich App at 673, citing *Reed*, 352 Mich at 294-295.

However, relative to this case, the 2010 IP Agreement contains the following provisions relevant to payment of commissions:

> 5.     I may terminate this Agreement for any reason, at any time . . . . VISALUS may terminate this agreement in writing upon violations of policies and procedures . . . . *In such event, no further commissions will be paid by VISALUS.* [Emphasis added.]
>
> * * *
>
> 13.     I will not make any false or misleading statements about VISALUS or its marketing program. I agree that I will operate in a lawful, ethical and moral manner and will not engage in or perform any misleading, deceptive or unethical practices. *In the event I violate any of these conditions, my position may be terminated without further payment or compensation of any kind.* [Emphasis added.]

The 2010 Manual states:

> If for any reason an IP violates any of the terms of the Agreement and/or these Policies and Procedures, ViSalus reserves the right to immediately deactivate or terminate the IP's position. *Such action by ViSalus will terminate any and all*

*rights of the IP and any further payments of any kind and is effective at the time of said violation.* [Emphasis added.]

These provisions govern payment of commissions after termination. They unambiguously state that a termination ends the IP's entitlement to "further payments of any kind." Unlike the facts presented to this Court in *KBD*, the contract is not silent with respect to payment of posttermination commissions and accordingly, the common-law procuring cause doctrine does not govern plaintiffs' entitlement to commissions. *KBD*, 295 Mich App at 673.

## E. PRETERMINATION COMMISSIONS

Plaintiffs also argue that the trial court erred in ruling that they have no claim for pretermination commissions. Again, we turn to the contract language to discern whether plaintiffs have a legally viable claim. The best-judgment provision in the 2010 and 2011 Manuals state:

> If for any reason an ID violates any of the terms of the Agreement and/or these Policies and Procedures, ViSalus reserves the right to immediately deactivate or terminate the ID's position. *Such action by ViSalus will terminate any and all rights of the ID and any further payments of any kind and is effective at the time of said violation.* [Emphasis added.]

The statement that termination and cancellation of future payments are "effective at the time of said violation," renders the cancellation of payments retroactive to the time of the violation. However, plaintiffs presented evidence that defendants did not intend to terminate his IP until Sweeney threatened litigation during the negotiation of his reinstatement. Call testified that Sweeney was entitled to approximately $21,000 in commissions, based on the monthly average of $5,300. This evidence supports a finding that the terminable offense did not occur until Sweeney made the litigation threats in March 2014. Therefore, a question of fact exists regarding plaintiffs' entitlement to commissions accrued by the "downline" during the suspension period. Thus, the trial court erred in granting summary disposition to defendants with respect to pretermination commissions. Accordingly, we reverse that portion of the trial court's order granting defendant summary disposition with respect to pretermination commissions and remand for further proceedings on that claim.

## III. DOCKET NO. 337612

In light of our decision to reverse in part the trial court's summary disposition order and remand for further proceedings on plaintiffs' claim for pretermination commissions, it is necessary to vacate the trial court's order awarding case evaluation sanctions to defendant because defendant is no longer in a posture of being a prevailing party entitled to sanctions. However, we will address this issue should defendant again be in a position to recover case evaluation sanctions after resolution of plaintiffs' claim for pretermination sanctions.

Whether case evaluation sanctions may be imposed against Sweeney involves a question of law, which we review de novo. *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008).

Sweeney and his corporation both participated in case evaluation and the case evaluation panel issued an award of $55,000 in favor of both plaintiffs. Within 28 days of a case evaluation panel's decision, each party "shall file a written acceptance or rejection of the panel's evaluation. . . ." MCR 2.403(L)(1). Defendant rejected the award and plaintiffs rejected the award by failing to file a response. MCR 2.403(L)(1). A party who rejects the panel's evaluation is subject to sanctions if he or she fails to improve upon his or her position at trial. *Van Elslander v Thomas Sebold & Assoc, Inc*, 297 Mich App 204, 213; 823 NW2d 843 (2012). MCR 2.403(O)(1) provides:

> If a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation. However, if the opposing party has also rejected the evaluation, a party is entitled to costs only if the verdict is more favorable to that party than the case evaluation.

A verdict is considered "more favorable" to the plaintiff if it is more than 10 percent above the evaluation, and it is considered "more favorable" to the defendant if it is more than 10 percent below the evaluation award. MCR 2.403(O)(3).

Although the parties agreed in the trial court that the corporation was the real party in interest, Sweeney was never dismissed as a party. We note that the parties have not been consistent regarding Sweeney's and the corporation's respective status. Plaintiffs argued that the 2013 IP Agreement was merely a "transfer," but plaintiffs raised the alternative argument that the 2013 IP Agreement was not a valid contract because defendant failed to send plaintiffs the reverse side and plaintiffs never signed or initialed the Terms of Agreement on the reverse side. The trial court ultimately ruled that it would rely only on the 2010 IP Agreement because, for purposes of summary disposition, this factual dispute must be resolved in plaintiffs' favor. In addition, Sweeney was a party to the case evaluation proceeding, and he was included as a party to the case evaluation award. Under these circumstances, the trial court did not err in imposing case evaluation sanctions jointly against Sweeney and the corporation.

We affirm in part and reverse in part the trial court's order granting summary disposition, vacate the order awarding case evaluation sanctions, and remand for further proceedings. Neither party having prevailed in full, no costs are awarded. MCR 7.219(A). We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Stephen L. Borrello
/s/ Michael J. Riordan

-14-