*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NORMAN YATOOMA & ASSOCIATES, PC,

Plaintiff-Appellee,

and

PNC BANK, NA,

Intervening Plaintiff-Appellee,

v

COHEN LERNER & RABINOVITZ, PC, and
STEVEN Z. COHEN,

Defendants-Appellants.

UNPUBLISHED
July 29, 2021

No. 352299
Oakland Circuit Court
LC No. 2016-153017-CB

Before: TUKEL, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

Defendants Cohen Lerner & Rabinovitz, PC (CLR) and Steven Z. Cohen (Cohen) (collectively "defendants") appeal a judgment that was entered by the trial court following the jury's verdict in this action. The judgment was entered in favor of plaintiff Norman Yatooma & Associates, PC (NYA) on its common-law conversion claim in the amount of $347,215.83. Defendants also challenge the trial court's denial of their motion for judgment notwithstanding the verdict (JNOV) and motion for a new trial. We affirm.

## I. BACKGROUND

This matter arises from Cohen's disbursement of certain funds and placement of certain funds into an IOLTA account maintained by his law firm, CLR. Cohen received these funds in relation to his representation of Jeffrey Spinello and Karen Hazelwood, who were former clients of NYA. Specifically, NYA and Norman Yatooma represented Spinello and Hazelwood in arbitration proceedings against Media Arts Group, Thomas Kinkade, and other related parties. The claim for arbitration was filed in September 2003, and the proceedings were contentious. While

-1-

Spinello and Hazelwood initially retained NYA on an hourly fee basis, NYA later agreed to represent Spinello and Hazelwood on a 45 percent contingency fee basis. On October 4, 2006, the arbitration panel awarded Spinello and Hazelwood damages, attorney fees, and costs. The Kinkade Company, which is a successor in interest to Media Arts Group, unsuccessfully sought to vacate the arbitration award. In 2010, a United States District Court entered judgment in the amount of $2,850,000. Soon thereafter, the Kinkade Company filed for Chapter 11 bankruptcy.

Days later, Spinello and Hazelwood "terminated" NYA, retained Cohen and CLR, and made a claim against the Kinkade Company in the bankruptcy court. The bankruptcy court confirmed a payment plan, whereby Spinello and Hazelwood were to receive quarterly payments from the bankruptcy estate. Although Spinello and Hazelwood received payments, they refused to turn over any portion to NYA. In August 2012, NYA filed suit against Spinello and Hazelwood. Attorney David Potts represented NYA in the action, and CLR and Cohen represented Spinello and Hazelwood. The parties entered facilitation and reached a settlement in the amount of $837,500 in October 2014. The recitals of the 2014 settlement agreement provided, in pertinent part, as follows:

> WHEREAS, Pacific Metro, LLC, formerly known as Thomas Kinkade Company, LLC, formerly known as Media Arts Group, Inc. ("Debtor") filed for bankruptcy in the United States Bankruptcy Court and said Court has approved its Debtor's Plan of Reorganization; and
>
> WHEREAS, Defendants are Plan Agent Account Beneficiaries under said Plan of Reorganization; and
>
> WHEREAS, Diablo Management Group is serving as the bankruptcy court's escrow agent ("Diablo"); and
>
> WHEREAS, pursuant to two (2) letters dated October 1, 2014, Defendants are entitled to quarterly payments toward their claim(s) from the Debtor . . . .

Additionally, the payment terms of the 2014 settlement agreement pertinently provided as follows:

> 1.	Plaintiff shall be entitled to receive the total amount of Eight Hundred Thirty Seven Thousand Five Hundred Dollars ($837,500) which amount shall be paid by Defendants in the following manner:
>
> a.	The Clerk of the Court ("Clerk") shall immediately pay to Plaintiff, through its counsel . . . those funds held in the Court's escrow account . . . . The Parties believe that the amount held by the Clerk is at least . . . ($264,788) . . . .
>
> b.	Plaintiff shall immediately receive . . . ($47,146) from the IOLTA trust account of [CLR], which amount constitutes a portion of the most recently received quarterly disbursements received from Diablo.
>
> c.	Commencing with the Diablo quarterly disbursement of January 2015, Plaintiff shall be entitled to seven . . . consecutive quarterly payments

of . . . ($65,700), which amount shall be paid from the [CLR] IOLTA account, if said Firm continues to be the recipient of the quarterly disbursements, or shall be paid from Diablo or its assign directly to Plaintiff or David W. Potts JD PLLC.

d.     Plaintiff shall be entitled to a final payment upon the eighth quarterly distribution from Diablo in whatever amount is necessary to bring the total payment received by Plaintiff to . . . ($837,500).

Thereafter, on June 29, 2015, the Kinkade Company's bankruptcy proceeding converted from a Chapter 11 to a Chapter 7, and the structural change resulted in a cessation of payments to Spinello and Hazelwood. At that time, Spinello and Hazelwood were still owed $1,100,000, and NYA was owed $459,866 under the settlement agreement. In July 2015, Cohen e-mailed Potts, indicating that Mark Mickelson had tentatively offered to purchase Spinello and Hazelwood's bankruptcy claim. Cohen indicated that, before a deal could be made, he required Yatooma's agreement that he would accept a pro rata share of the sale proceeds, as opposed to the "total remaining balance of $459,866" that he was owed under the settlement agreement. Although Cohen requested that Potts contact him with an answer within two hours, Potts did not respond to that e-mail or to the other e-mails that Cohen sent in August 2015 and October 2015, which reflected that Mickelson had offered to purchase the claim for $550,000. Having received no response from Potts or Yatooma, Spinello and Hazelwood sold their bankruptcy claim to Mickelson for $550,000 on October 18, 2015.

On October 27, 2015, defendants came into possession of the sale proceeds. CLR received a portion of the funds for its "legal fees and costs," and Spinello and Hazelwood received $240,027.34. $35,000.34 was deposited into CLR's IOLTA account. This amount was intended to be used for future fees and costs in the event that NYA filed suit against Spinello and Hazelwood again. Cohen also placed $234,531.66 into CLR's IOLTA account, noting that it was the amount that he "had promised" NYA.

In January 2016, Yatooma began requesting that Cohen turn over the funds to NYA. During the proceeding, the parties vehemently disputed whether Yatooma had agreed to execute a release in exchange for the funds. After Cohen refused to turn over the funds unless Yatooma signed a proposed release agreement, NYA filed suit. In relevant part, NYA claimed that defendants had engaged in common-law conversion[1] by refusing to turn over the $234,531.66 and also by transferring a portion of the sale proceeds to "third parties." NYA also pleaded a claim for declaratory relief, requesting that the trial court declare that the funds held by defendants were NYA's property and that the trial court order that defendants immediately turn over the funds.

In lieu of filing an answer to the complaint, defendants moved for summary disposition. NYA filed a cross-motion for summary disposition in response. Although the trial court denied both motions based on a finding that genuine issues of material fact existed, the trial court later

---

[1] During the course of the proceeding, NYA also alleged claims of statutory conversion, unjust enrichment, and tortious interference with a contract. The jury found that NYA failed to establish its claims for statutory conversion and unjust enrichment. The trial court dismissed the tortious interference with a contract claim after defendants moved for directed verdict.

granted NYA's second motion for summary disposition on its claim for declaratory relief. Specifically, the trial court held that defendants did not dispute that the $234,531.66 belonged to NYA and that Cohen's conduct demonstrated that he knew that NYA had not consented to receiving only $234,531.66 of the sale proceeds. The trial court ordered defendants to "immediately turn over $269,530.00 ($234,531.66 plus $35,000.34)" to NYA. The trial court concluded that its ruling rendered the remainder of NYA's claims moot. The trial court denied defendants' cross-motion for summary disposition. Defendants appealed.

On October 18, 2018, this Court reversed the trial court's decision to grant summary disposition in favor of NYA, finding that genuine issues of material fact existed. *Norman Yatooma & Assoc, PC v Cohen*, unpublished per curiam opinion of the Court of Appeals, issued October 18, 2018 (Docket Nos. 338368; 339003; 339047), pp 7-9. Following remand, on April 15, 2019, NYA and defendants filed their third motions for summary disposition. The arguments contained in the motions with respect to the common-law conversion claim were consistent with the arguments contained in the parties' previous motions. The trial court denied the motions, noting that this Court had "made it real, real clear" that questions of fact existed for trial.

In September 2019, trial commenced. At trial, NYA argued that it was entitled to the full balance due under the settlement agreement, and defendants argued that the settlement agreement only provided NYA with property rights in the proceeds distributed by Diablo from the bankruptcy estate. At NYA's close of proofs, defendants unsuccessfully moved for directed verdict on the common-law conversion claim, and the jury ultimately returned a verdict in favor of NYA on that claim. However, the parties disputed whether the jury intended to award NYA $112,684.17 or $347,215.83. After the trial court entered judgment in the amount of $347,215.83, defendants filed a motion for a new trial, a motion for JNOV, and a motion to amend judgment. The trial court denied defendants' motions, and this appeal followed.

## II. THE TRIAL COURT'S DENIAL OF DEFENDANTS' MOTIONS FOR SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Generally, this Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

> A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id*. at 160 (quotation marks, citations, and emphasis omitted).]

"Courts are liberal in finding a factual dispute sufficient to withstand summary disposition." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 476; 776 NW2d 398 (2009) (citation omitted). Although a trial court tests the factual support of a plaintiff's claim when it rules upon a motion for summary disposition under MCR 2.116(C)(10), a trial court may not

resolve factual disputes or determine the credibility of witnesses when ruling on a motion for summary disposition. *White v Taylor Distrib Co, Inc*, 275 Mich App 615, 624-625; 739 NW2d 132 (2007). When the truth of a movant's material factual assertion rests on a deponent's credibility, a genuine issue of material fact exists and summary disposition under MCR 2.116(C)(10) should not be granted. *Id*. at 625.

## B. RELEVANT AUTHORITY

"Conversion . . . is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 303 Mich App 441, 447; 844 NW2d 727 (2013) (quotation marks and citation omitted). "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Dep't of Agriculture v Appletree Mktg, LLC*, 485 Mich 1, 14; 779 NW2d 237 (2010). "To support an action for conversion of money, the defendant must have an obligation to return the specific money entrusted to his care." *Head v Phillips Camper Sales & Rental, Inc*, 234 Mich App 94, 111; 593 NW2d 595 (1999). Indeed, if the plaintiff "never had a property interest in the funds that it demanded," the defendant "cannot be deemed to have converted [the] proceeds[.]" *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 592; 682 NW2d 233 (2004).

## C. ANALYSIS

Defendants raise a myriad of arguments to support that the trial court erred by denying their motions for summary disposition, most of which relate to whether the 2014 settlement agreement granted NYA a property interest in the bankruptcy sale funds. Defendants also argue that summary disposition was proper because they complied with Michigan Rule of Professional Conduct (MRPC) 1.15 by depositing the $234,531.66 into the IOLTA account. However, in this Court's October 2018 opinion, it concluded that there were genuine issues of material fact as to whether NYA, "represented by Potts, and Spinello, represented by defendants, reached an oral agreement in which [NYA] would release its claim against Spinello in exchange for the $234,531.86 now held by defendants." *Norman Yatooma & Assoc, PC*, unpub op at 7. This Court also concluded that there was a genuine issue of material fact as to whether NYA was "entitled to the funds in the first place under its 2014 settlement agreement with Spinello." *Id*. Although this Court did not specifically analyze the settlement agreement, this Court "note[d] that the trial court's finding that defendants admitted that the funds belonged to plaintiff [was] not supported by the record." *Id*. at 9. This Court stated:

> Defendants consistently asserted that . . . the 2014 settlement agreement only provides for payment of funds received through the Chapter 11 bankruptcy. Those payments ceased when the Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy. Because the Chapter 11 bankruptcy no longer exists, argue defendants, the 2014 settlement agreement is void because it is now impossible to perform (supervening impossibility). Making the alleged obligation even murkier is that the funds at issue do not emanate from the bankruptcy estate that was the subject of the underlying agreement, but from Spinello's sale of the bankruptcy claim to a third party. In any event, the record demonstrates that defendants do not agree that the

funds belong to plaintiff, and the trial court's finding to the contrary is therefore erroneous. [*Id*.]

Because this Court impliedly held that an ambiguity in the settlement agreement existed[2] and explicitly held that a question of fact existed as to whether the parties agreed to alter the agreement, the law of the case doctrine applies. This doctrine provides that "if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." *Grievance Administrator v Lopatin*, 462 Mich 235, 259; 612 NW2d 120 (2000) (quotation marks and citation omitted). As a general rule, the law of the case binds lower courts, which may not take an action on remand that is inconsistent with the appellate court's decision on the case. *Id*. at 260. In this case, following remand, the trial court made it clear that it was crafting its rulings to conform with this Court's October 2018 opinion. Given that the trial court was following this Court's directive and complying with the law of the case doctrine, we fail to see how the trial court erred by declining to grant summary disposition based on defendants' argument that the settlement agreement did not provide NYA with a property interest in the proceeds and based on defendants' purported compliance with MRPC 1.15.

Next, defendants argue that summary disposition in their favor was proper because NYA was estopped from arguing that it was entitled to more than a pro rata share of the sale proceeds in exchange for the release of the remainder of NYA's claim. Assuming without deciding that estoppel applies to conversion claims, we conclude that summary disposition was not proper on this ground.

> [E]stoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. [*Holt v Stofflet*, 338 Mich 115, 119; 61 NW2d 28 (1953) (quotation marks and citations omitted).]

The undisputed evidence at the summary disposition stage did not establish that defendants relied on NYA's silence. Rather, Cohen's repeated e-mails to Potts demonstrate that he wanted to ensure that NYA would accept less than the amount of money that NYA was owed under the settlement agreement in the event that the bankruptcy claim was sold. Indeed, Cohen indicated several times that he *needed* Yatooma's consent. While Cohen ultimately assisted Spinello and Hazelwood with selling their claim to Mickelson, the e-mails support that this was done because there was a timeline associated with Mickelson's offer—as opposed to Cohen's rightful reliance on the purported "induce[ments]" by Yatooma on behalf of NYA. See *id*. Additionally, it is difficult to discern how defendants could have reasonably believed that NYA's silence amounted to consent to an alteration of the 2014 settlement agreement given that the agreement provided that "modification[s] or alteration[s]" had to be made in writing. Indeed, if defendants had actually

---

[2] "Ambiguities in a contract generally raise questions of fact for the jury[.]" *Farmers Ins Exch v Kurzmann*, 257 Mich App 412, 418; 668 NW2d 199 (2003).

believed that NYA had consented to receiving a lesser amount of money, it reasonably follows that Cohen—a very experienced attorney who was involved in the 2014 settlement negotiations— would have sent the proposed release agreement much earlier than February 2016. Consequently, the trial court did not err by denying summary disposition based on the estoppel argument.

Defendants also argue that summary disposition was proper because the undisputed record evidence established that NYA failed to establish a "lack of debtor creditor relationship." See *Head*, 234 Mich App at 112 (holding that, to establish a claim for conversion, "[t]he defendant must have obtained the money without the owner's consent to the creation of a debtor and creditor relationship") (quotation marks and citation omitted). Although NYA, Spinello, and Hazelwood were involved in a debtor and creditor relationship, the record does not demonstrate that NYA and defendants were involved in such a relationship. Indeed, defendants' role simply involved transferring funds to NYA. Summary disposition was therefore improper on this ground.

Defendants make several other arguments to support that summary disposition was proper during the proceeding. However, because these arguments are unpreserved, we decline to consider them. See *Nuculovic v Hill*, 287 Mich App 58, 63; 783 NW2d 124 (2010).

## III. THE TRIAL COURT'S DENIAL OF DEFENDANTS' MOTION FOR DIRECTED VERDICT

### A. STANDARD OF REVIEW

"This Court [generally] reviews de novo a trial court's ruling on a motion for directed verdict." *Barnes v 21 Century Premier Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 347120) (2020); slip op at 10.

> A motion for directed verdict challenges the sufficiency of the evidence. A directed verdict is only appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. If reasonable persons could honestly reach different conclusions regarding whether the nonmoving party established a claim, the motion for directed verdict must be denied, with the case being resolved by the jury. [*Id*. (citations omitted).]

### B. ANALYSIS

Defendants first argue that directed verdict in their favor was proper because the evidence established that NYA was estopped from arguing that it was entitled to more than a pro rata share of the sale proceeds in exchange for the release of the remainder of NYA's claim. We disagree. Cohen testified at trial that, if Yatooma or Potts had contacted Cohen and indicated that NYA expected to be paid the remaining balance under the settlement agreement, Cohen would have advised Spinello and Hazelwood "not to sell the claim because they would have received nothing out of it." However, as already discussed, Cohen's e-mails to Potts reflected that Cohen believed that NYA had to consent to receiving only a pro rata share of the sale proceeds. The e-mails that were sent to Potts by Cohen were admitted into evidence, as was the 2014 settlement agreement. Additionally, the testimony of Yatooma and Potts established that they did not have a good relationship with Cohen, thereby undercutting Cohen's testimony that he believed that NYA's

silence equated to consent. Consequently, whether Cohen relied on Yatooma and Potts's silence was a credibility issue, and "[c]redibility determinations are inappropriate for purposes of ruling on a motion for directed verdict." *Barnes*, ___ Mich App at ___; slip op at 10 (quotation marks and citation omitted). Consequently, directed verdict on the basis of defendants' estoppel defense was improper.

Defendants also argue that directed verdict in their favor was proper because there was no evidence that Cohen, as an individual, converted any funds. We disagree. There was no dispute at trial that Cohen had placed certain funds in CLR's IOLTA account and then refused to turn those funds over to NYA despite Yatooma's multiple requests. Additionally, Cohen testified that he allotted some of the sale proceeds to CLR, to Spinello, and to Hazelwood. Cohen never disputed that he was the individual who handled the funds. Rather, Cohen's defense was that he was carrying out the orders of Spinello and that he had an ethical obligation to do so. Although defendants argue that Cohen cannot be held individually liable because he was consistently acting as an agent of CLR, defendants offer little analysis to support this argument. Additionally, the limited authority that defendants cite does not support their argument that Cohen could not be held individually liable. Therefore, the trial court did not err by denying defendants' motion for directed verdict as to Cohen individually. For these same reasons, we also conclude that the trial court did not err by denying defendants' motion for JNOV with respect to Cohen. See *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003).

Although defendants raise other arguments to support that they were entitled to directed verdict, those arguments are unpreserved and will therefore not be considered. See *Nuculovic*, 287 Mich App at 63.

## IV. JURY INSTRUCTIONS

Defendants next argue that the trial court abused its discretion by concluding that a proposed mitigation instruction was inapplicable to the facts of this case. We disagree. "Claims of instructional error involve questions of law, which this Court reviews de novo. A trial court's determination regarding whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *In re Piland*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 353436); slip op at 3 (citation omitted).

When discussing the proposed jury instructions, the trial court held that it would not give instructions on breach of contract issues, which included the proposed mitigation instruction. In so holding, the trial court stated: "It's not a contract case." Jury instructions should include all elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). "Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from wrongdoing." *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 538; 854 NW2d 152 (2014). "Specifically, when one has committed a legal wrong against another, the latter has an obligation to use reasonable means under the circumstances to avoid or minimize his or her

damages and cannot recover for damages that could thus have been avoided." *Id*. The proposed mitigation instruction in this case provided as follows:

> A person has a duty to use ordinary care to minimize his or her damages *after* [he or she/his or her property] has been [injured/damaged]. It is for you to decide whether plaintiff failed to use such ordinary care and, if so, whether any damage resulted from such failure. You must not compensate the plaintiff for any portion of [his/her] damages which resulted from [his/her] failure to use such care. [Emphasis added.]

Defendants argue that the mitigation instruction was proper because NYA failed to mitigate its damages because "Yatooma and Potts intentionally refused to communicate with Cohen regarding Spinello's plan to sell the bankruptcy claim and the proposed prorated distribution of the funds." Because defendants argue that NYA failed to mitigate its damages *before* it had been injured and/or damaged by the sale of the bankruptcy claim, the mitigation instruction was improper. Additionally, the evidence clearly established that, after the sale took place, NYA sought to recover $459,866, which was the balance due under the 2014 settlement agreement. There is also no evidence that NYA's property was injured or damaged. Indeed, defendants vehemently denied that NYA had any property right to the sale funds. At most, NYA's ability to collect money from Spinello and Hazelwood was hampered as a result of the bankruptcy proceeding converting to a Chapter 7 proceeding, thereby making the sale of the bankruptcy debt at a lesser amount desirable to Spinello and Hazelwood. While NYA arguably could have obtained certain funds earlier, this would have required accepting less than the amount that NYA was owed. Therefore, we conclude that the trial court did not abuse its discretion by denying defendants' request to instruct the jury on mitigation.

## V. THE TRIAL COURT'S DENIAL OF DEFENDANTS' MOTION FOR A NEW TRIAL

### A. STANDARDS OF REVIEW

This Court reviews a trial court's "decision to exclude evidence for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (quotation marks and citations omitted). Under MCR 2.611(A)(1)(e), a trial court may grant a new trial when a jury's verdict was "against the great weight of the evidence or contrary to law." In *Campbell v Sullins*, 257 Mich App 179, 193; 667 NW2d 887 (2003), this Court stated:

> We review the trial court's denial of a motion for a new trial for an abuse of discretion. In deciding whether to grant or deny a motion for a new trial, the trial court's function is to determine whether the overwhelming weight of the evidence favors the losing party. This Court gives substantial deference to a trial court's determination that the verdict is not against the great weight of the evidence. This Court and the trial court should not substitute their judgment for that of the jury unless the record reveals that the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. [Citations omitted.]

### B. ANALYSIS

### 1. PRECLUDING DEFENDANTS' LEGAL ETHICS EXPERT FROM TESTIFYING AT TRIAL

Defendants argue that the trial court improperly precluded legal ethics expert Kenneth Mogill from testifying at trial, thereby denying defendants a fair trial. We disagree.

Defendants named Robert McAuliffe as a damages expert, and NYA moved to preclude McAuliffe from testifying at trial. During a June 2019 hearing, the trial court questioned why defendants needed such an expert. When defense counsel was unable to provide an adequate explanation, the trial court concluded that counsel on both sides were both "taking a really simple case and making it a lot more difficult than it is." The trial court then held that neither NYA nor defendants would be permitted to call expert witnesses at trial, noting that "the experts are just going to muddy the waters." The trial court then entered an order, which provided that the parties were precluded from calling experts at trial. The order specifically referenced Mogill.

"The requirements for the admission of expert testimony are: (1) the witness must be an expert; (2) there must be facts in evidence which require or are subject to examination and analysis by a competent expert; and (3) there must be knowledge in a particular area which belongs more to an expert than to the common man." *King v Taylor Chrysler-Plymouth, Inc*, 184 Mich App 204, 215; 457 NW2d 42 (1990) (quotation marks and citation omitted). "[T]he critical inquiry with regard to expert testimony is whether such testimony will aid the factfinder in making the ultimate decision in the case." *Id*. (quotation marks and citation omitted).

In this case, defendants argue that Mogill's testimony was necessary to provide the jury with an explanation of MRPC 1.15. However, MRPC 1.15 was read into evidence at trial, and we fail to see how "the common man" would be unable to understand the meaning of that rule. Furthermore, Cohen testified at trial that he believed that his actions were consistent with MRPC 1.15's mandates. In so testifying, Cohen noted that he had reviewed MRPC 1.15 with his law partner, who "sits on the Attorney Discipline Board." Additionally, Cohen provided testimony to support that neither Yatooma nor Potts responded to his repeated e-mails, thereby resulting in Cohen believing that NYA was not claiming more than a pro rata share of the sale proceeds, i.e., that the "disputed" amount was no more than $234,531.66. Cohen testified that, based on this, he complied with Spinello's instructions regarding disbursement of the sale proceeds. Consequently, the trial court did not abuse its discretion by determining that expert testimony on the issue of legal ethics was unnecessary. It therefore reasonably follows that the trial court did not abuse its discretion by denying defendants' motion for a new trial on this ground.

### 2. PRECLUDING CERTAIN EVIDENCE CONCERNING THE 2014 FACILITATION

Defendants next argue that the trial court abused its discretion by precluding certain evidence relating to the 2014 facilitation. We disagree.

When Cohen was testifying on direct examination about the 2014 facilitation, defense counsel asked "Who was present at the facilitation with Mr. Nirenberg?" The trial court interjected, ruling that facilitation was "sacrosanct" and could not be discussed. Even to the extent that the trial court abused its discretion by precluding certain evidence relating to the facilitation,

we conclude that such an error would be harmless. See MCR 2.613(A). Indeed, the 2014 settlement agreement was admitted into evidence at trial, and the enunciations contained in the transcript outlining the terms of the settlement are entirely consistent with the language of the settlement agreement.

Additionally, although Potts testified that Spinello and Hazelwood were obligated to pay NYA regardless of the "source," Potts also agreed that certain payments that were due under the settlement agreement were to be funded through payments made by Diablo. Cohen testified that the proceeds from the bankruptcy sale were "outside of the terms of the [settlement] agreement" because the agreement was conditioned upon receipt of the quarterly payments from Diablo. When asked if Yatooma "had an absolute right under the settlement agreement to collect the remaining balance," Cohen responded "No, he did not. He had a contingent right based upon the payments that these two penniless people would receive."

Perhaps most importantly, Spinello testified about his and Hazelwood's financial statuses in October 2014. According to Spinello, at the time of the facilitation, he "had nothing" and was working at Wal-Mart for $11 per hour. When asked if Hazelwood had "money to pay off [the remaining balance] outside of the quarterly payments," Spinello responded "No, she had no ability to pay it either." Spinello indicated that, if he had been required to pay the remaining balance out-of-pocket, he would have filed for bankruptcy because there was "no way [he] could pay that" given that he "didn't have any money" outside the quarterly payments from Diablo. Thus, contrary to defendants' arguments on appeal, they were able to admit evidence of Spinello and Hazelwood's financial statuses in October 2014. This evidence went to the whether the parties had intended for NYA to be entitled to certain funds that were disbursed from the bankruptcy estate by Diablo. We therefore conclude that any error is harmless and that the trial court did not abuse its discretion by denying defendants' motion for a new trial.

### 3. PRECLUDING DEFENDANTS' BANKRUPTCY EXPERT FROM TESTIFYING AT TRIAL

Defendants argue that the trial court abused its discretion by precluding the testimony of Brian Harvey, thereby denying them a fair trial. We disagree.

Harvey is a bankruptcy attorney who worked with defendants on the sale of the bankruptcy claim. Ten days before trial was scheduled to commence, defendants noticed Harvey's de bene esse deposition to take place on Friday, September 13, 2019, in Los Angeles, California. NYA filed an emergency motion to quash, arguing in relevant part that defendants had failed to give reasonable notice of the deposition, that Harvey's testimony was irrelevant, and that Harvey should be precluded from testifying as an expert given the trial court's previous order precluding all expert testimony. Over defendants' objections, the trial court granted the motion, concluding that the notice was not reasonable and that the trial court's previous order precluded the testimony of experts.

MCR 2.306(B)(1) provides in relevant part as follows: "A party desiring to take the deposition of a party on oral examination must give reasonable notice in writing to every other party to the action." Because the court rule does not define "reasonable," it is proper to consult a dictionary definition. *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004); MCL 8.3a.

*Black's Law Dictionary* (11th ed) defines "reasonable" as "[f]air, proper, or moderate under the circumstances; sensible[.]"

In this case, it is clear that the notice was not reasonable, especially when considering that the deposition was a de bene esse deposition. While defendants argue that counsel for NYA could have participated remotely "[g]iven how depositions are being taken during the current pandemic," the deposition was scheduled to occur before the pandemic. The notice also appears to have caught NYA off guard given that the trial court had previously precluded experts from testifying. Defendants' responsive pleading clearly demonstrates that defendants sought expert testimony from Harvey concerning bankruptcy law. Moreover, contrary to defendants' arguments, holding such a deposition so close to trial could have prejudiced NYA. Indeed, in the event that either NYA or defendants determined that it was proper to move the trial court to redact portions of Harvey's testimony, the parties would have had little time to file the appropriate motions. The trial court also would have had little time to consider the motions. The trial court therefore did not abuse its discretion by quashing the subpoena and notice, thereby essentially precluding Harvey from providing testimony at trial.[3]

## 4. CONCLUSION

In sum, the trial court did not abuse its discretion by denying defendants' motion for a new trial. In so holding, we note that defendants argue that, "[t]o the extent this Court determines summary disposition was properly denied on three occasions, then Defendants argue for the very same reasons that there was indeed insufficient evidence to support a finding of conversion based on these arguments, and that the jury's finding to the contrary is against the overwhelming weight of the evidence." Because this argument is contained in a footnote, is improperly presented, and is entirely cursory, we conclude that it is abandoned and will not consider it. See *Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003). See also *Ypsilanti Fire Marshal v Kircher (On Reconsideration)*, 273 Mich App 496, 553; 730 NW2d 481 (2007).

## VI. ENTRY OF JUDGMENT

Defendants argue that the trial court improperly entered judgment against Cohen individually given that the verdict form only refers to a singular defendant. Defendants also argue that the trial court improperly entered judgment in the amount of $347,215.83 when the verdict form "unequivocally limits common-law conversion damages to $112,684.17." We conclude that defendants are not entitled to relief.

The jury found that NYA was entitled to damages as to the common-law conversion claim. The first preliminary question on the verdict form required the jury to answer whether NYA had "a right to any of the $550,000 proceeds from the sale of the Spinello/Hazelwood claim in the Kinkade bankruptcy." The jury answered "yes," which required the jury to answer a second

---

[3] Even if Harvey's testimony concerning Chapter 7 and Chapter 11 bankruptcy proceedings would have been helpful to the jury, any error in precluding his expert testimony in this area would have been harmless given the testimony of Cohen and Spinello and the jury instruction provided by the trial court relating to bankruptcy proceedings.

preliminary question. That question was "[w]hat amount of the $550,000 sale proceeds belonged to [NYA]?" The jury answered "$234,531.66." The form then provided questions concerning the specific counts, i.e., unjust enrichment, common-law conversion, and statutory conversion. With respect to the common-law conversion count, the jury answered "yes" to the following question:

> Did *Defendant* wrongfully commit any distinct act of dominion or control over Plaintiff's property that was in denial of, or inconsistent with, Plaintiff's ownership of the money? [Emphasis added.]

When asked if NYA suffered damages, the jury answered "yes." When asked the amount of damages, the jury answered "$112,684.17." The form did not require that the jury indicate the full amount of damages that it was awarding, nor did members of the jury indicate on the record the full amount that it was awarding.[4]

While it is unclear from the form whether the jury intended to award NYA $112,684.17 or $347,215.83 and while the verdict form only refers to a singular defendant in relation to the common-law conversion claim, it is undisputed that defendants crafted the verdict form without any assistance from NYA. Importantly, after NYA objected to defendants' proposed verdict form based on an argument that the initial questions would cause confusion, defendants did not stipulate to revise the form. Indeed, defendants thanked the trial court after it held that it would "follow" defendants' proposed verdict form.

It is well settled that "[a] party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken at trial." *Holmes v Holmes*, 281 Mich App 575, 587-588; 760 NW2d 300 (2008) (quotation marks and citation omitted). In other words, a "[r]espondent may not assign as error on appeal something that [he] deemed proper in the lower court because allowing [him] to do so would permit respondent to harbor error as an appellate parachute." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). Because defendants crafted the verdict form and advocated for its use over NYA's objections that the form would cause "confusion," we conclude that defendants are not entitled to the relief they seek, i.e., reduction of the damage award to $112,684.17 and vacating the portion of the judgment relating to Cohen as an individual.

## VII. THE TRIAL COURT'S DENIAL OF DEFENDANTS' MOTION FOR JNOV

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's ruling on a motion for JNOV. *Sniecinski*, 469 Mich at 131. The evidence and all legitimate inferences are viewed in a light most favorable to the nonmoving party. *Id*. A motion for JNOV should only be granted if the evidence establishes or fails to establish a claim as a matter of law. *Id*. "If reasonable jurors could have honestly

---

[4] During a hearing, counsel for NYA indicated that members of the jury explained off of the record that they had intended to award $347,215.83.

reached different conclusions, the jury verdict must stand." *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 260-261; 617 NW2d 777 (2000).

## B. ANALYSIS

Defendants first argue that the trial court erred by denying their motion for JNOV given that the evidence established that Spinello—as opposed to defendants—was liable for conversion because Spinello had an ownership interest in the bankruptcy sale proceeds. In so arguing, however, defendants only offer cursory arguments with no citation to relevant authority, thereby abandoning the argument. See *Houghton ex rel Johnson*, 256 Mich App at 339.

Defendants next argue that Cohen's compliance with MRPC 1.15 precluded the jury from finding that NYA had established its common-law conversion claim. However, this argument turns in part on the verdict. Specifically, defendants assert that the jury concluded that only the amount of money contained in the IOLTA account ($234,531.66) "belonged" to NYA. Based on this, defendants argue that the jury could not conclude that the $234,531.66 was converted because MRPC 1.15 required that defendants hold that amount in the IOLTA account. Because of the manner in which the verdict form was drafted, however, it is unclear whether the jury determined that NYA was only entitled to a portion of the $234,531.66 or whether the jury determined that NYA suffered additional damages as a result of the transfer of the remainder of the $550,000, i.e., whether the jury found that funds beyond those contained in the IOLTA account were converted. As already discussed above, defendants are not entitled to relief on appeal as a result of their own conduct, i.e., crafting a verdict form that caused confusion. See *In re Hudson*, 294 Mich App at 264.

Moreover, to the extent that the jury intended to award a portion of the funds contained in the IOLTA account or all of the funds contained in the IOLTA account, both of these decisions would have been supported by the evidence. Cohen's testimony at trial supports that he viewed the $234,531.66 that was placed in the trust account as NYA's pro rata share of the sale proceeds. Specifically, Cohen testified that, after CLR was paid its outstanding fee and Spinello and Hazelwood were paid a certain amount, he placed the $234,531.66 in a trust account. Cohen's testimony continued as follows:

> I then put the rest of it—it stayed in the trust because that's the amount of money I had promised Mr. Yatooma's firm and it stayed there. And, had I gotten an objection or anything else I probably would have acted differently. But, at that point nobody had objected to the distribution I had indicated I was going to make. And, I never heard anything actually until late January, the following year.

Cohen then withheld the funds from NYA based on Yatooma's purported promise to sign a release agreement in exchange for the $234,531.86. However, Yatooma's alleged promise was made *months* after Cohen had placed the funds in the IOLTA account. The jury's finding that $234,531.86 "belonged" to NYA supports that the jury rejected Cohen's testimony that Yatooma agreed to execute a release in exchange for the $234,531.86.

Additionally, to the extent that the jury decided to award funds beyond those contained in the IOLTA account, this decision was also supported by the evidence. Indeed, the evidence

supports that Spinello and Cohen recognized that NYA had rights under the settlement agreement beyond the quarterly payments made by Diablo. As a result of this, Cohen repeatedly attempted to gain NYA's input concerning the sale of the bankruptcy claim and attempted to obtain NYA's consent to obtain a pro rata share of the sale proceeds. The fact that Yatooma and Potts ignored Cohen's attempts supports that they believed that the 2014 settlement agreement was dependent on the receipt of the quarterly payments from Diablo. Additionally, the fact that Spinello and Hazelwood instructed Cohen to set aside funds in the event that NYA filed another suit against them supports that they also did not view the agreement as being dependent on the receipt of the quarterly payments. Indeed, Cohen testified that Spinello felt "uneasy" about NYA's lack of response. Therefore, the evidence supports that defendants converted funds beyond those contained in the IOLTA account by transferring the balance of the funds to CLR, Spinello, and Hazelwood. See *Appletree Mktg, LLC*, 485 Mich at 14.

Affirmed.


/s/ Jonathan Tukel
/s/ David H. Sawyer
/s/ Thomas C. Cameron

-15-